# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                       :

CHARLES ARENTOWICZ,          :      07 Civ. 6092 (LAP)
                                         :
              Petitioner,          :      ECF Case
                                         :
    - against -                 :
                                         :
CAP GEMINI ERNST & YOUNG U.S.,LLC,   :
                                         :
             Respondents.       :
                                         :
-----------------------------------------------------------x

---

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD

---

McMORAN, O'CONNOR & BRAMLEY
A Professional Corporation
Ramshorn Executive Centre
Building D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
(732) 223-7711
Attorneys for Charles Arentowicz

On the Brief:

Bruce P. McMoran, Esq.
Douglas S. Bramley, Esq.

# TABLE OF CONTENTS

<u>Page No.</u>

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ..........................................................................iii

PRELIMINARY STATEMENT ....................................................................... 1

RELEVANT PROCEDURAL HISTORY ...................................................... 5

STATEMENT OF JURISDICTION................................................................ 8

STATEMENT OF FACTS .............................................................................. 9

LEGAL ARGUMENT

POINT I

THE ARBITRATORS MANIFESTLY DISREGARDED
CGE&Y'S BURDEN OF PRODUCTION UNDER
THE LAW................................................................................................... 23

   A.  The <u>McDonnell Douglas/Burdine</u> Framework
      Is Clearly Applicable ............................................................... 24

      1. The <u>McDonnell Douglas</u> burden shifting
         framework ...................................................................... 24

      2. CGE&Y's burden of production under <u>Burdine</u> ........................... 26

      3. CGE&Y's burden of production under <u>McDonnell
         Douglas</u> is defined, explicit and clearly applicable .................... 28

      4. The Arbitration Panel was aware of
         <u>McDonnell Douglas</u> ........................................................... 29

   B. The Arbitrators Manifestly Disregarded CGE&Y's
      Burden Of Production Under <u>McDonnell Douglas</u>
      And <u>Burdine</u>......................................................................... 30

      1. CGE&Y introduced no admissible evidence
         of the reason for Arentowicz's termination ............................... 30

2. Arbitrator Maltby recognized CGE&Y's failure to support its articulated reason for terminating Arentowicz ......................................................... 35

3. Arbitrators Townley & Feliu disregarded CGE&Y's burden of production under McDonnell Douglas ...................................................................... 37

CONCLUSION......................................................................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cap Gemini Ernst & Young U.S. LLC v. Arentowicz*,
    2004 WL 1386145 ...................................................................................5

*DiRussa v. Dean Witter Reynolds, Inc.*,
    121 F.3d 818 ...........................................................................................28

*First Options of Chicago v. Kaplan*,
    514 U.S. 938 ...........................................................................................22

*Four Seasons Software, LLC v. ICICI Infotech, Inc.*,
    2006 WL 3791386 ...................................................................................28

*Fuentes v. Perskie*, 32 F.3d 759 ...........................................................................32

*Furnco Construction Corp. v. Waters*,
    438 U.S. 567 ...........................................................................................23

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 .............................................................................................29

*Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 ...................................................22

*Hoeft v. MVL Group, Inc.*, 343 F.3d 57 ............................................................22

*J. Acciardo v. Millenium Securities Corp.*,
    83 F.Supp.2d 413 ...................................................................................22

*Johnson v. Women's Christian Alliance*,
    76 F.Supp.2d 582 ...........................................................................25, 26

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 ..............................1, 6, 7, 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*,
    808 F.2d 930 ...........................................................................................27

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 ...........................................................................................22

*Partington v. Broyhill Furniture Industrial, Inc.*,
    999 F.2d 269 ...........................................................................................22

*Postal Service Board of Governors v. Aiken,*
  460 U.S. 711 ....................................................................................................26

*Reeves v. Sanderson Plumbing Prod Inc.,*
  530 U.S. 133 .......................................................................................25, 33, 34

*St. Mary's Honor Center v. Hicks,* 509 U.S. 502 .....................................26, 27, 37

*Stoddard v. Eastman Kodak Co.,*
  2007 WL 952020 ..............................................................................................27

*Texas Department of Committee Affairs v. Burdine,*
  450 U.S. 248 ..............................................................1, 5, 7, 23, 24, 25, 26,
                                                 30, 32, 33, 36, 39

*Waldron v. SL Industries, Inc.,* 56 F.3d 491 ......................................................24

*Wilko v. Swan,* 346 U.S. 427.............................................................................22

*Willemijn v. Standard Microsystems,*
  103 F.3d 9 ...................................................................................................34, 35

## STATE CASES

*Erickson v. Marsh and McLennan Co.,*
  117 N.J. 539 ......................................................................................................27

*Ferrante v. American Lung Association,*
  90 N.Y.2d 623....................................................................................................27

*Greenberg v. Camden Vsc. Schools,*
  310 N.J.Super. 189.............................................................................................24

*Jerista v. Murray,* 185 N.J. 175 .........................................................................21

*Maiorino v. Schering Plough Corp.,*
  302 N.J.Super. 323 (App.Div.) ..........................................................................24

*Murray,* 311 N.J.Super. at 176.......................................................................32, 36

*Visick v. Fowler Equip. Co.,* 173 N.J. 1...............................................................23

*Zive. v. Stanley Roberts, Inc.,* 182 N.J. 436.........................................................23

Petitioner Charles Arentowicz ("Arentowicz") submits this memorandum of law, the accompanying Certification of Bruce P. McMoran, Esq. ("McMoran Cert."), and the exhibits annexed thereto, in support of his motion to vacate the Final Award of Arbitrators Rosemary Townley, Esq. and Alfred G. Feliu, Esq. (the "Arbitrators"), dated April 4, 2007 (the "Award"), denying Arentowicz's claim of age discrimination under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1, *et seq.*

## PRELIMINARY STATEMENT

The Award should be vacated because it was rendered in manifest disregard of the black letter law set forth by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), which was clearly and repeatedly spelled out for the Arbitrators. The Court in <u>McDonnell Douglas</u> defined the order and allocation of proof in statutory employment discrimination cases. Under that framework, adopted by the New Jersey Supreme Court in <u>Andersen v. Exxon Co.</u>, 89 N.J. 483 (1982), the plaintiff first has the burden of proving a *prima facie* case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. Once the plaintiff makes this showing, a mandatory presumption of discrimination is created. <u>Id</u>. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden of production shifts to the defendant to rebut the presumption of discrimination by introducing evidence supporting a legitimate, nondiscriminatory reason for its actions. <u>Id</u>. Third, should the employer carry this burden, the plaintiff then has an opportunity to prove that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. <u>Id</u>., at 804.

In denying Arentowicz's age claim under the NJLAD, the Arbitrators inexplicably ignored Respondent Cap Gemini Ernst & Young U.S. LLC's ("CGE&Y") burden of production under the second-step of the <u>McDonnell Douglas</u> burden shifting

1

framework, as affirmed and refined by the Court in <u>Texas Dept. of Comm. Affairs v.</u> <u>Burdine</u>, 450 U.S. 248 (1981). In <u>Burdine</u>, the Court held that under the second step of <u>McDonnell Douglas</u>, in order to rebut the presumption of discrimination raised by the plaintiff's *prima facie* case, the employer must come forward with admissible evidence supporting the legitimate, nondiscriminatory reason articulated for its actions. <u>Burdine</u>, 450 U.S. at 254-255. If the employer is silent in the face of this burden, judgment must be entered for the plaintiff as a matter of law. <u>Id</u>.

CGE&Y completely failed to satisfy its burden of production under <u>Burdine</u>. CGE&Y terminated Arentowicz's employment in December 2002 after twenty-three (23) years of service. For over two (2) years, CGE&Y refused to provide any explanation to Arentowicz as to why he had been fired. Then, twenty-six (26) months after the termination, CGE&Y produced a document allegedly showing the reason Arentowicz was selected for termination in a reduction-in-force. CGE&Y relied on this document in defense of Arentowicz's age claim for over one year until the person responsible for terminating Arentowicz - David Wilson - testified at his deposition that the document was entirely false and did not identify the real reason Arentowicz was fired.

Through David Wilson's deposition testimony in February 2006, CGE&Y claimed that Arentowicz had actually been fired due to a lack of "immediate revenue generation or sales opportunities" in 2003. However, CGE&Y failed to come forward with a shred of admissible evidence in discovery or at the arbitration hearing supporting this alleged reason. CGE&Y relied almost exclusively on the arguments of counsel. Most importantly, CGE&Y failed to produce "sales pipeline documents" from August to December 2002 which showed Arentowicz's current and projected sales. The viability of CGE&Y's articulated reason for terminating Arentowicz turned entirely on information

2

contained in these documents. CGE&Y had sole and exclusive possession of the documents and was aware within five (5) months of Arentowicz's termination of the need to preserve such information. Nevertheless, CGE&Y withheld the sales pipeline documents so Arentowicz would not have a full and fair opportunity to show that, in fact, he had over $9.5 million in the sales pipeline for 2003, which more than doubled the amount ($3 to $5 million) CGE&Y claimed Arentowicz needed to be safe from termination.

In the absence of the formal sales pipeline documents from CGE&Y, Arentowicz introduced documents in his possession which showed his 2001 and 2002 sales numbers, as well as his projected sales in 2003 at his largest client, Merck & Co., Inc. These documents confirmed what Arentowicz testified the formal sales pipeline documents would have shown if CGE&Y had produced them, i.e., that he was on pace for $10 million in sales for 2002 (with $7.3 in sales already closed through September 2002) and had $9.5 in sales in the pipeline for 2003.

Despite this undisputed evidence that Arentowicz should have been safe from termination under the criteria CGE&Y articulated ($3 to $5 million), and CGE&Y's total failure to come forward with any evidence supporting its claim that Arentowicz did not have the sales necessary to justify his continued employment, the Arbitrators rejected Arentowicz's age claim on the grounds that he failed to provide sufficient evidence showing "the likelihood that he [ ] would produce or sell immediate revenue in the months following the [reduction-in-force]."

The Award completely disregards CGE&Y's clearly defined obligations under McDonnell Douglas in two respects. First, CGE&Y's failure to satisfy its burden of production under McDonnell Douglas by coming forward with evidence sufficient to

3

support its articulated reason for terminating Arentowicz should have resulted in a judgment for Arentowicz as a matter of law. By effectively remaining silent in the face of this obligation, and not producing any evidence of Arentowicz's projected sales, CGE&Y failed to rebut the presumption of discrimination that arose upon Arentowicz's presentation of a *prima facie* case. Second, the Award fails to recognize that the only reason Arentowicz was not able to provide more specific evidence of his projected sales in 2003 was because CGE&Y withheld this information. Indeed, by rejecting Arentowicz's age claim because he was unable to produce evidence in the possession of CGE&Y, the Arbitrators deprived Arentowicz of due process by denying him a full and fair opportunity to show pretext under the third-step of <u>McDonnell Douglas</u>.

In essence, the Arbitrators turned the <u>McDonnell Douglas</u> framework on its head by rewarding CGE&Y for withholding information that would have proved or disproved its termination reason. The Arbitrators were aware of CGE&Y's burden of production under <u>McDonnell Douglas</u> because, if they were not already familiar with this well-recognized legal principle, Arentowicz thoroughly outlined the burden shifting methodology in both his pre and post hearing briefs, and repeated it during opening arguments. Based on the foregoing, the Award should be vacated insofar as it denies Arentowicz's claim of age discrimination under the NJLAD.

# RELEVANT PROCEDURAL HISTORY[1]

## A.    The Arbitration Agreement

Arentowicz began employment with Arthur Young & Co. on August 8, 1977. In 1989, Arthur Young & Co. merged with Ernst & Whinney to form Ernst & Young, LLP. In May 2000, Ernst & Young, LLP sold its consulting division to Cap Gemini, S.A., a European company headquartered in Paris. Arentowicz was a partner in the Ernst & Young, LLP consulting division sold to Cap Gemini, S.A.

The new entity, called Cap Gemini Ernst & Young, U.S. LLC ("CGE&Y"), forced Arentowicz to execute a written contract of employment (the "Agreement") if he wished to continue his employment with CGE&Y.[2] Paragraph 5 of the Agreement required Arentowicz to settle by arbitration any controversy arising out of his employment, including claims of discrimination, in accordance with the arbitration procedures set forth in Annex 4 to the Agreement and the commercial arbitration rules of the American Arbitration Association (AAA).[3]

CGE&Y prepared the Agreement and presented it to Arentowicz on a take-it-or-leave-it basis. Arentowicz had no opportunity to negotiate the terms of the Agreement or to obtain the assistance of counsel. CGE&Y instructed Arentowicz that if he did not sign the Agreement, he would be terminated. To avoid losing his job, Arentowicz signed the Agreement on April 22, 2000.[4]

---

[1] Attached to the McMoran Cert. as Exhibit C are full and complete copies of the hearing transcripts from December 4, 5 and 6, 2006, references to which are cited hereafter as "Tr.__." Transcript cites are examples only and not an exhaustive list of evidence for the point for which they are cited. Also provided in separately bound exhibit books are true and accurate copies of all exhibits admitted into evidence at the hearing on behalf of Arentowicz (Exhibits R-1 to R-65) and CGE&Y (CG-1 to CG-47), references to which are cited hereafter as "Arentowicz Ex. R-__," and "CGE&Y Ex. CG-__."
[2] Arentowicz Ex. R-1
[3] Id.
[4] Id.

On December 11, 2002, CGE&Y terminated Arentowicz's employment in an alleged reduction-in-force. Arentowicz asserts that CGE&Y unlawfully terminated his employment because of his age in violation of the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1, *et seq.*

**B.    Arentowicz Challenged The Arbitration Agreement**

In October 2003, Arentowicz filed a civil action against CGE&Y in the Superior Court of New Jersey (the "New Jersey action") seeking a declaratory judgment that the arbitration provision in the Agreement was an unconscionable contract of adhesion and alleging age discrimination under the NJLAD. CGE&Y removed the New Jersey action to the United States District Court for the District of New Jersey and filed a separate action in the United States District Court for the Southern District of New York seeking to compel arbitration of Arentowicz's claims. On June 22, 2004, the Hon. Deborah A. Batts, U.S.D.J., granted CGE&Y's motion in the Southern District of New York to compel arbitration. Cap Gemini Ernst & Young U.S. LLC v. Arentowicz, 2004 WL 1386145 (S.D.N.Y.). The New Jersey action was subsequently dismissed in July 2004 by the Hon. William G. Bassler, U.S.D.J.

**C.    The Arbitration Panel**

Pursuant to Judge Batts' ruling, and Paragraph 5 of the Agreement, Arentowicz submitted his age discrimination claim to arbitration with AAA. Cap Gemini Ernst & Young U.S. LLC v. Charles Arentowicz, AAA Case No. 131600015104.[5] Annex 4 to the Agreement provides that the arbitration shall be conducted before a panel of three (3)

---

[5] CGE&Y filed a claim against Arentowicz in arbitration seeking attorney's fees arising out of his alleged breach of the arbitration agreement. The full Arbitration Panel denied CGE&Y's breach of contract claim. Arentowicz does not seek to vacate that portion of the Final Award.

6

arbitrators to be selected as provided by AAA rules.[6] Following the procedure provided by AAA, CGE&Y selected Alfred G. Feliu, Esq. to serve as a neutral arbitrator. Arentowicz selected Lewis T. Maltby, Esq. to serve as a neutral arbitrator. Together, Arbitrators Feliu and Maltby selected Rosemary Townley, Esq. to serve as the third arbitrator (collectively referred to as the "Arbitration Panel"). All of the arbitrators, including the party-appointed arbitrators, were to remain neutral.

### D.    The Arbitration Hearing

On November 20, 2006, the parties submitted comprehensive pre-hearing briefs to the Panel detailing the facts and law applicable to Arentowicz's claim of age discrimination under the NJLAD.[7] Arentowicz's pre-hearing brief included a thorough description of the procedural burden-shifting methodology articulated by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) for the analysis of statutory discrimination claims.[8]

The Arbitration Panel held hearings in New York on December 4, 5 and 6, 2006 and received oral and documentary evidence.[9] Following the hearing, at the Arbitration Panel's request, the parties submitted post-hearing briefs addressing the facts admitted into evidence and the law applicable to Arentowicz's age claim.[10] Arentowicz's post-hearing brief again included a thorough description of the procedural burden-shifting methodology set forth in <u>McDonnell Douglas</u>, 411 U.S. 792.[11] The parties also submitted post-hearing reply briefs, which were limited by the Arbitration Panel to five (5) pages.[12]

---

[6] Arentowicz Ex. R-1
[7] McMoran Cert., Ex. A, Ex. B
[8] McMoran Cert., Ex. A, pgs. 30-37
[9] McMoran Cert., Ex. C
[10] McMoran Cert., Ex. D, Ex. E
[11] McMoran Cert., Ex. D, pgs. 65-72
[12] McMoran Cert., Ex. F, Ex. G

**E.    A Split-Decision**

On April 4, 2007, Arbitrators Townley and Feliu issued a Final Award rejecting Arentowicz's age discrimination claim. In a written opinion accompanying the Final Award, Arbitrators Townley and Feliu held that Arentowicz "did not carry his burden of demonstrating age discrimination under the [NJLAD]."[13] Arbitrator Maltby disagreed and wrote a strongly worded Dissenting Opinion in which he stated that "Arentowicz has submitted significant evidence of discrimination . . . while [CGE&Y] has provided nothing of substance, despite the fact that it had control of documents that went to the core of the dispute."[14]

Arentowicz files this motion to vacate the Award of Arbitrators Townley and Feliu on the grounds that they manifestly disregarded CGE&Y's burden of production under the McDonnell Douglas burden shifting framework, as defined by the United States Supreme Court in Burdine, 450 U.S. 248.

## STATEMENT OF JURISDICTION

Petitioner Arentowicz is a citizen and resident of the State of New Jersey and at all times relevant to this action, was employed by CGE&Y in New Jersey. Respondent CGE&Y is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 Times Square, New York, New York, 10036. CGE&Y is not a citizen of New Jersey. The arbitration hearing was held in New York on December 4, 5 and 6, 2006 pursuant to the jurisdictional requirements set forth the arbitration portion of the Agreement.

---

[13] McMoran Cert., Ex. H.
[14] McMoran Cert., Ex. I.

The jurisdiction of this Court is invoked under the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1, *et seq.*, and under 28 U.S.C. § 1332. This action is between citizens of different states, involves the review of an arbitration award, issued in New York, that was rendered in manifest disregard of the law, and the amount in controversy exceeds the jurisdictional requirement of $75,000. Arentowicz claims back pay and front pay economic damages resulting from his unlawful termination that exceed $8,500,000,[15] plus unspecified compensatory damages for pain and suffering, punitive damages and attorney's fees under the NJLAD.

## STATEMENT OF FACTS[16]

### A.     Background

Arentowicz began his employment with Arthur Young & Co. in August 1977 as a Senior Consultant.[17] He specialized in providing consulting services in the area of technology. Arentowicz was promoted to Senior Manager in 1984 and to Partner in 1987.[18]

In 1989, Arthur Young & Co. merged with Ernst & Whinney to form Ernst & Young, LLP.[19] Arentowicz continued his partnership with Ernst & Young, LLP. In May 2000, Ernst & Young, LLP sold its consulting division to Cap Gemini, S.A., a European company headquartered in Paris. Arentowicz was required to relinquish his partnership as a result of the acquisition, but continued his employment with the new entity - CGE&Y – as a Vice President in the area of Life Sciences consulting.

---

[15] Arentowicz Ex. R-29
[16] A comprehensive recitation of the facts is set forth in Arentowicz's Post-Hearing Brief. McMoran Cert., Ex. D. The facts set forth herein are intended only as a synopsis and are not an exhaustive list of the facts supporting Arentowicz's age claim against CGE&Y.
[17] McMoran Cert., Ex. C, Tr.95:17-21
[18] Id., Tr.95:22-96:2
[19] Id., Tr.96:3-7

On December 11, 2002, CGE&Y terminated Arentowicz's employment in an alleged reduction-in-force after over twenty-three (23) years of service with CGE&Y and its predecessor companies. Arentowicz was age fifty-four (54) at the time of his termination and held the position of Vice President in CGE&Y's Life Sciences Americas practice (the equivalent status of partner under the new structure), where he was the account executive and engagement director for one of Life Sciences' most profitable consulting clients – Merck & Co., Inc. Arentowicz was the Merck account executive and engagement director from 1997 until his termination in December 2002.[20] As account executive, he was responsible for all sales, delivery, customer satisfaction, and profitability on the Merck account and received credit for all sales and revenue generated from the account whether initiated by Arentowicz or a member of his team.[21] As an engagement director, Arentowicz managed the delivery of work on the Merck account within the allotted timeframe and budget.[22]

Arentowicz also managed the J.D. Edwards software service line for CGE&Y, which involved assisting J.D. Edwards in selling its software and installation services to CGE&Y's Life Sciences consulting clients.[23]

**B.    Arentowicz's Job Performance**

In 2001, the first full year following CGE&Y's acquisition of Ernst & Young, LLP's consulting practice, Arentowicz's job performance exceeded expectations. He achieved total sales bookings of over $13 million, including $10.9 million in sales for the J.D. Edwards service line (versus an $8 million sales goal), and $2.95 million in sales on

---

[20] McMoran Cert., Ex.C, Tr.104:13-23.
[21] Id., Tr.102:2-16.
[22] Id., Tr.102:13-24.
[23] Id., Tr.105:7-13.

the Merck account (versus a $3 million sales goal), which was a 50% increase from 2000.[24] He received an overall performance rating of "Exceeds Expectations" in every single category on his 2002 performance review.[25]

Under Arentowicz's management, Merck became the most profitable account in CGE&Y's Life Sciences Americas practice for the combined years 2000/2001, with a two (2) year profit of $1,313,045, and a 33.4% profit percentage.[26] Further, with over $8 million in overall net revenue managed in 2000/2001, at a profit of 27%, Arentowicz was the fifth most profitable engagement director out of thirty-six (36) in the Life Sciences practice.[27] Arentowicz received a bonus of $55,414 for his performance in 2001,[28] plus an additional $5,000 discretionary bonus in special recognition of his "outstanding achievements during 2001."[29]

Arentowicz's solid performance continued in 2002 despite a down economy. Through September 2002, he had $5.2 million in sales at Merck, a 76% increase from 2001 in only nine (9) months,[30] and over $2.1 million in sales on the J.D. Edwards service line.[31] In Arentowicz's 2002 performance review, which was last modified on November 26, 2002, only two (2) weeks before Arentowicz was fired, the reviewer, noted that "[Chuck] had incredible success at a client (Merck) in a tough economy."[32] The review stated further that:

---

[24] Arentowicz Ex. R-2, CG0681-82.
[25] Arentowicz Ex. R-2, CG0688
[26] Arentowicz Ex. R-3, CA000105
[27] Arentowicz Ex. R-3, CA000106
[28] Arentowicz Ex. R-46
[29] Arentowicz Ex. R-4
[30] McMoran Cert., Ex. C, Tr.113:10-13
[31] Arentowicz Ex. R-5, CG0064.
[32] Id., at CG0069-70

**Chuck's numbers are solid this year.** Although the profit % is lower than in past years, **they did make money which is better than many of the engagements in [Life Sciences]**. (emphasis added).[33]

Thus, days before his termination, Arentowicz showed significant increased sales at Merck and was on target for $10 million in total sales in 2002. Arentowicz's sales numbers in 2001/2002 were undisputed by CGE&Y at the arbitration hearing.

## C.    Projections for 2003

Arentowicz positioned the Merck account to have even more significant sales growth in 2003. In fact, based on the projected revenue stream from Merck in 2003, CGE&Y considered promoting Merck from the Americas region to the Global Services Unit (GSU) in the fall of 2002.[34] CGE&Y placed accounts in the GSU only if they attained, or were expected to attain, $15 to $20 million in annual sales, and had the potential to result in multiple revenue streams globally.[35]

In connection with Merck's consideration as a GSU account, Arentowicz prepared sales projections for Merck which showed anticipated global sales in 2003 of $15 million, with revenue of $9 million.[36] In the North American region alone, for which Arentowicz was responsible, Merck had projected sales in 2003 of $9.5 million, with $5.7 million in projected revenue.[37] This represented an 82.6% increase in sales compared to 2002. These sales numbers were not mere conjecture. Arentowicz's 2003 sales projections included information on specific sales he was on the verge of closing at Merck in 2003, including projects that were necessary follow-on engagements to existing

---

[33] Id.
[34] McMoran Cert., Ex. C, Tr.114:7-11
[35] Id., Tr.114:14-19, Tr.372:13-16.
[36] Arentowicz Ex. R-6.
[37] Id.

work.[38] Further, the 82.6% increase in sales was consistent with the 76% increase in sales Arentowicz had produced at Merck for the first nine (9) months of 2002.[39] CGE&Y would have recognized revenue from these Merck sales beginning in January 2003 and continuing until December 2003, with some possible overlap into 2004.[40]

Arentowicz introduced the 2003 sales projections for Merck into evidence at the arbitration hearing.[41] CGE&Y did not object to their admission nor did CGE&Y introduce any evidence that Arentowicz's accounts were not going to generate revenue in 2003. Further, CGE&Y was aware of the $9.5 million sales projection at Merck in 2003 before Arentowicz was terminated and never questioned the projections.[42]

D.    David Wilson – The Decisionmaker

CGE&Y alleges that the decision to terminate Arentowicz's employment was made by David Wilson ("Wilson").[43] Wilson first joined the Life Sciences Americas practice in January 2002.[44] He had no prior experience in Life Sciences, or in the pharmaceutical, medical device or biotechnology industries.[45] Despite his inexperience, CGE&Y appointed Wilson to take over as Leader of the Life Sciences Americas practice in May 2002.[46] His assignment to Life Sciences was a short term position. Wilson left the employ of CGE&Y only eight (8) months later in early January 2003.[47]

---

[38] McMoran Cert., Ex. C, Tr.209:6-23.
[39] Arentowicz Ex. R-5, CG0064
[40] McMoran Cert., Ex. C, Tr.263:2-10.
[41] McMoran Cert., Ex. C, Tr.114:20-117:11.
[42] McMoran Cert., Ex. C, Tr.117:9-118:6
[43] Arentowicz Ex. R-9, Wilson Dep., T16:21-24, T18:16-17
[44] Id., at T76:2-5
[45] Id., at T77:16-78:2
[46] Id., at T78:3-7
[47] McMoran Cert., Ex. C, Tr.342:12-17

Wilson had never worked with Arentowicz before May 2002 and had no knowledge or opinion of his job performance before that date.[48] Wilson never reviewed any of Arentowicz's performance reviews or his personnel file,[49] and in the eight (8) months Wilson supervised Arentowicz from May to December 2002, Wilson never viewed Arentowicz's job performance as unsatisfactory.[50]

Wilson met Arentowicz only two to three times between May and December 2002 in very brief meetings and at no time did he ever ask Arentowicz about: (a) the past, current, or projected sales at Merck;[51] (b) the past performance of Merck;[52] or (c) current or projected sales on the J.D. Edwards service line.[53] Wilson never met with anyone at Merck,[54] and was not even aware Arentowicz generated revenue by handling the J.D. Edwards service line.[55]

### E.     CGE&Y Failed To Give Arentowicz A Reason For His Termination

Given Arentowicz's outstanding past, present and future potential performance, and his limited interaction with Wilson, Arentowicz was mystified by his inclusion in the December 2002 reduction-in-force. Arentowicz was particularly troubled that CGE&Y retained several younger Vice Presidents who had not generated any sales or revenue for CGE&Y as of December 2002 and were not expected to do so in the immediate future. Arentowicz believed he had been unlawfully terminated because of his age.

---

[48] Arentowicz Ex. R-9, Wilson Dep., T80:4-81:1
[49] McMoran Cert., Ex. C, Tr.344:6-13, Tr.344:15-20
[50] McMoran Cert., Ex. C, Tr.126:5-7, Tr.344:21-25
[51] McMoran Cert., Ex. C, Tr.121:22-123:1
[52] Id., at Tr.123:13-15
[53] Id., at Tr.122:2-123:5.
[54] McMoran Cert., Ex. C, Tr.123:16-18
[55] Arentowicz Ex. R-9, Wilson Dep., T73:12-74:3.

CGE&Y failed to give Arentowicz any reason for his termination at the time of his firing in December 2002.[56] Nor was a reason included in the termination letter Arentowicz received.[57] Thus, on December 12, 2002, the day after his firing, Arentowicz prepared a detailed e-mail to Wilson demanding an explanation for his termination.[58] Arentowicz received no response from anyone at CGE&Y.

In March 2003, Arentowicz retained the law firm of McMoran, O'Connor & Bramley, P.C. On May 2, 2003, the firm sent a detailed letter to CGE&Y outlining Arentowicz's age discrimination claim and demanding the preservation of all documents relating to the termination of his employment.[59] As such, CGE&Y was fully aware of Arentowicz's age claim, and of the need to preserve documents relating thereto, within five (5) months of Arentowicz's termination in December 2002.

**F.      CGE&Y's Termination Reason Is Knowingly False**

In December 2004, following the submission of Arentowicz's age claim to arbitration, Arentowicz served Interrogatories asking CGE&Y in Interrogatory No. 6 to set forth and describe the reason(s) for his termination. CGE&Y responded by stating that Interrogatory No. 6 was "inappropriate in the context of arbitration and [was] inconsistent with the purpose behind the arbitral remedy."[60] CGE&Y failed to provide any explanation as to why Arentowicz was fired. In fact, it had been two (2) years since CGE&Y fired Arentowicz and CGE&Y still had not articulated any reason for its actions.

Finally, in February 2005, twenty-six (26) months after Arentowicz was fired, CGE&Y produced documents which, for the first time, revealed the alleged reason for his

---

[56] McMoran Cert., Ex. C, Tr.126:5-7,
[57] Arentowicz Ex. R-22
[58] Arentowicz Ex. R-3
[59] McMoran Cert., Ex. C, Tr.267:4-7
[60] Arentowicz Ex. R-12

termination. Specifically, CGE&Y produced redacted documents bates stamped CG0151-153, titled: Senior Executive Separation Program H2 2002 ("Exhibit R-13"), which identified the Vice Presidents in the Life Sciences practice selected for termination in the December 2002 reduction-in-force and the reason why each Vice President had been terminated.[61] In Exhibit R-13, CGE&Y claimed Arentowicz was fired because:

> Due to Restructuring: was Account Exec for Merck and this account has been moved to the GSU (another Business Unit) and the [Account Executive] role given to a GSU VP in that [Business Unit] (Bob Gray). Have no other role for him. Has not demonstrated ability to sell effectively enough on his own to bring in new account. Overleveraged in LS by 4.

The termination reason CGE&Y set forth in Exhibit R-13 proved to be entirely bogus. In February 2006, one (1) year after CGE&Y produced Exhibit R-13, Arentowicz deposed David Wilson who admitted, under oath, that the termination reason listed by CGE&Y on Exhibit R-13 was false and was not an accurate reflection of the reason Arentowicz was fired.[62] When shown Exhibit R-13, Mr. Wilson testified:

> **Q:**    Is that an accurate reflection of the reasons for Mr. Arentowicz's termination?

> **A:**    Well, not as I looked at it, no.[63]

> . . . . . . . .

> **Q:**    So, is it your testimony that this explanation [on Exhibit R-13] under RIF Selection Criteria is not an accurate reflection of the reason for Mr. Arentowicz's termination?

> **A:**    Yes.

> **Q:**    It is not accurate?

> **A:**    Yes, it is not accurate.

---

[61] Arentowicz Ex. R-13

[62] All of the deposition transcripts, including Wilson's deposition transcript, were admitted into evidence at the arbitration hearing and were included as part of the record.

[63] Arentowicz Ex. R-9, Wilson Dep., T53:6-8

**Q:**     Do you have any idea where this information came from?

**A:**     Well, no.

**Q:**     Are you aware of any document anywhere that accurately reflects the reason for Mr. Arentowicz's termination?

**A:**     No, I am not aware.[64]

Wilson confirmed at the arbitration hearing that the termination reason CGE&Y listed on Exhibit R-13 was false and was never part of his thinking as to why Arentowicz was included in the reduction-in-force.[65] Thus, for a period of over three years, CGE&Y either articulated no reason for its actions, or an admittedly false reason.

### G.     CGE&Y Changes Its Story

After failing to articulate any termination reason for more than two years, then providing a false reason in Exhibit R-13, CGE&Y next claimed Arentowicz was terminated based on a lack of "immediate revenue generation or sales opportunities."[66] The first time CGE&Y articulated this alleged reason for Arentowicz's firing was at Wilson's deposition in February 2006, more than three years after CGE&Y fired Arentowicz.[67] CGE&Y failed to produce any document – either in discovery or at the arbitration hearing - supporting this new termination reason. In fact, CGE&Y admitted that there was not a single document anywhere reflecting this alleged reason for including Arentowicz in the December 2002 reduction-in-force.[68]

CGE&Y claimed that from August to October 2002, Wilson considered Arentowicz's projected sales and revenue for the fourth quarter of 2002 into 2003 as

---

[64] Id., at T54:18-6
[65] McMoran Cert., Ex. C, Tr.376:22-377:4
[66] McMoran Cert., Ex. C, Tr.290:19-291:2
[67] Arentowicz Ex. R-9, Wilson Dep., T22:25-26:24
[68] Arentowicz Ex. R-10, Jadick Dep., T26:6-27:11; McMoran Cert., Ex. C., Tr.293:25-294:7

compared to other Vice Presidents in the Life Sciences practice.[69] CGE&Y alleged that Arentowicz was selected for termination because he was not expected to generate "significant new sales within the next couple of months."[70] CGE&Y maintained that Wilson completed this comparative financial analysis with the assistance of his three member executive team, an informal leadership council.[71] Wilson testified that the executive team met three to four times between August and October 2002 and unanimously agreed on Arentowicz's selection for termination based on his projected lack of immediate revenue generation and sales opportunities in 2003.[72]

However, CGE&Y failed to produce a single document of any kind showing that these executive team meetings took place, or evidencing the three month comparative analysis Wilson allegedly completed.[73] Further, two members of the executive team, Joseph Lemaire and Maryann Gallivan, who Wilson claimed were involved in the selection process, appeared at the arbitration hearing and testified, under oath, that they had no involvement in the decision to terminate Arentowicz's employment.[74]

### H.  Arentowicz's Sales And Revenue Numbers For 2002 / 2003

CGE&Y claimed that a Vice President in the Life Sciences Americas practice was expected to generate $3 to $5 million in sales in order to be safe from termination in the December 2002 reduction-in-force.[75] Arentowicz generated $7.3 million in aggregate sales for the first nine (9) months in 2002, and was on target for $10 million in total sales

---

[69] McMoran Cert., Ex.C, Tr.415:9-12, Tr.425-6-14
[70] Arentowicz Ex. R-9, Wilson Dep., T26:25-27
[71] Id., at T20:7-21:11
[72] Id., at T39:5-40:6, T44:6-45:15
[73] McMoran Cert., Ex. C, Tr.367:14-17
[74] Id., at Tr.92:13-15, Tr.594:17-19
[75] Arentowicz Ex. R-9, Wilson Dep., T28:4-18, T106:18-107:11; McMoran Cert., Ex. C, Tr.361:4-6

in 2002.[76] This fact is undisputed based upon the documents provided by CGE&Y and Arentowicz's 2002 performance review.

Further, on Merck alone – not counting J.D. Edwards - Arentowicz had projected sales in 2003 of $9.5 million, with $5.7 million in projected revenue.[77] These projections represented an 82.6% increase in sales at the Merck account compared to 2002. CGE&Y would have recognized revenue from these sales beginning in January 2003.[78] These 2003 sales projections were not mere speculation. Arentowicz introduced into evidence at the hearing a sales/revenue projection document[79] which included information on specific sales he was on the verge of closing in 2003.[80] Arentowicz prepared the document in the fall of 2002 in connection with Merck's consideration as a GSU account. He had no idea he was about to be terminated and no idea that the sales projections would be relevant to his arbitration claim. Indeed, the 82.6% increase in sales projected for 2003 was consistent with the 76% increase in sales Arentowicz produced for the first nine (9) months of 2002.[81]

Based on Arentowicz's 2002/2003 sales numbers ($9-10 million per year), and the sales CGE&Y claimed a Vice President needed to be safe from termination ($3-5 million per year), Arentowicz should not have been considered for termination.

## I.    CGE&Y Hired And Retained Younger Vice Presidents

In describing the alleged reason for the December 2002 reduction-in-force, Laurie Jadick, CGE&Y's former Chief People Officer, testified that CGE&Y was "losing

---

[76] Arentowicz, Ex. R-5, CG0064
[77] McMoran Cert., Ex. C, Tr.115:11-24; Arentowicz Ex. R-6
[78] McMoran Cert., Ex. C, Tr.263:2-10
[79] Arentowicz Ex. R-6
[80] McMoran Cert., Ex. C, Tr.209:6-23
[81] Arentowicz, Ex. R-5, CG0064

literally hundreds of millions of dollars in the United States," was "overleveraged at the senior level," and had "too many senior people who weren't generating revenue or sales."[82] She claimed that the primary criterion for terminating employees was "the immediate opportunities for the individual to be generating sales and revenue," and that if a Vice President "had no immediate sales that . . . they were responsible for, that person would have been considered a candidate for the reduction-in-force."[83]

If that were the case, CGE&Y would have instituted a hiring freeze in 2002 to control costs and prevent further overstaffing at the "senior level." That did not happen. Instead, CGE&Y hired Joseph Coppola ("Coppola"), age thirty-nine (39), and Douglas Helmink ("Helmink"), age forty-seven (47), as Vice Presidents in the Life Sciences Americas practice at a combined cost of $570,000.[84] Arentowicz, who was significantly older at age fifty-four (54), earned an annual base salary of only $308,665, which CGE&Y easily recouped from the $7.3 million in combined account sales Arentowicz generated from Merck and J.D. Edwards through September 2002.[85] CGE&Y had every reason to believe Arentowicz would continue to meet or exceed his sales expectations since he was in the midst of a year (2002) in which he had increased Merck sales by 76% to $5.2 million in only nine (9) months.[86] For the preceding two year period (2001-2002), sales at Merck had increased by 126% and Arentowicz was the fifth most profitable engagement director out of thirty-six. Further, Arentowicz projected $9.5 million in sales from Merck North America beginning in January 2003 – an 82.6% increase.[87]

---

[82] McMoran Cert., Ex. C, Tr.292:17-293:2
[83] Id., at Tr.317:22-318:3, Tr.290:19-291:19
[84] Arentowicz Ex. R-15, Exhibit R-19, Exhibit R-15
[85] Arentowicz Ex. R-5, CG0064
[86] Id.
[87] McMoran Cert., Ex. C., Tr.263:4-10

In contrast to Arentowicz's sales, internal documents produced by CGE&Y confirm that as of December 2002, neither Coppola nor Helmink had produced any sales and/or revenue for CGE&Y,[88] neither was assigned as the account executive for any Life Sciences account,[89] and there was not one iota of evidence introduced at the hearing that either Coppola or Helmink had any immediate sales or revenue projected for 2002 and/or 2003. As such, these facts are undisputed. Nevertheless, CGE&Y retained the two younger men and terminated Arentowicz, which by itself renders false CGE&Y's assertion that the only termination criterion was "an individual's immediate revenue generating or sales opportunities."[90]

### J.      CGE&Y Failed To Satisfy Its Burden Of Production

In the face of this undisputed evidence that Arentowicz should not have been selected for termination under the criteria CGE&Y articulated, i.e., immediate sales and revenue, CGE&Y argued that Arentowicz's 2003 sales projections for Merck were not accurate and that he did not have enough revenue in the pipeline to justify his continued employment. CGE&Y claimed that internal "sales pipeline documents," which Wilson allegedly relied upon in deciding to terminate Arentowicz, showed that "Arentowicz was not bringing in real, material current revenue and that nothing of any significance was on the horizon in the next one to three months."[91] CGE&Y never produced the internal pipeline documents either in discovery or at the hearing. The only documents in the record regarding Arentowicz's sales numbers where CGE&Y documents that Arentowicz had in his possession. These documents showed without contradiction that Arentowicz

---

[88] Arentowicz Ex. R-20
[89] Arentowicz, Ex. R-21
[90] McMoran Cert., Ex. C, Tr.290:19-291:2
[91] McMoran Cert., Ex. G, pg. 3

21

had $7.3 million in sales through September 2002 and projected sales at Merck in 2003 of $9.5 million[92]

Despite having full knowledge of Arentowicz's age claim since May 2003, and of his request to preserve all documents relating thereto, CGE&Y failed to produce the internal sales pipeline documents Wilson allegedly relied upon in selecting Arentowicz for termination. Instead, on the eve of the arbitration hearing, CGE&Y produced pipeline documents for the month after Arentowicz was fired, i.e., January 2003, which the Arbitration Panel properly excluded from evidence as unreliable and outdated.[93]

The late production of the excluded pipeline documents from 2003 confirms that CGE&Y maintained sales pipeline information and that such information was available for the relevant time period, i.e., August to December 2002. All CGE&Y had to do to satisfy its burden of production under Burdine, and support its defense that Arentowicz was terminated because he did not have any sales and/or revenue projected for 2003, was produce the pipeline information for the relevant period. CGE&Y failed to do so.

Arentowicz did not have access to the "sales pipeline documents" for 2002/2003 (which would have confirmed the 2003 sales projections he prepared in connection with Merck's consideration as a GSU account, i.e., $9.5 million). As in most employment cases, the employer, CGE&Y, had sole and exclusive possession of this material. CGE&Y chose not to produce the documents even though Arentowicz requested them and CGE&Y's entire defense was based on information allegedly contained therein. CGE&Y's failure to produce this information suggests CGE&Y concealed and/or

---

[92] Arentowicz Ex. R-5, CG0064; Arentowicz Ex. R-6
[93] McMoran Cert., Ex. C, Tr.432:20-442:22

destroyed the documents because they were unfavorable, i.e., they did not support CGE&Y's alleged non-discriminatory reason for terminating Arentowicz and showed that Arentowicz had a significant sales pipeline at Merck in 2003, as reflected in the sales projection document introduced into evidence at the hearing.[94] Jerista v. Murray, 185 N.J. 175, 202 (2005) (factfinder can infer from spoliation of evidence that the evidence destroyed was not favorable to the spoliator); Partington v. Broyhill Furniture Indus., Inc., 999 F.2d 269 (7th Cir.1993) (if employer, being sensitive to possibility of suit, destroys files containing evidence most relevant to suit, inference arises that employer purged incriminating evidence).

## LEGAL ARGUMENT

### POINT I

### THE ARBITRATORS MANIFESTLY DISREGARDED CGE&Y'S BURDEN OF PRODUCTION UNDER THE LAW

The Second Circuit Court of Appeals has recognized that an arbitration award may be vacated if it is rendered in "manifest disregard of the law." Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 201-203 (2d Cir.1998); see J. Acciardo v. Millenium Securities Corp., 83 F.Supp.2d 413, 417 (S.D.N.Y.2000).[95] The manifest disregard doctrine applies if: "(1) the arbitrator[s] knew of a governing legal principle yet refused to apply it or ignored it altogether; and (2) the law ignored by the arbitrator[s] was well defined, explicit, and clearly applicable to the case." Hoeft v. MVL Group, Inc., 343 F.3d 57, 64 (2d Cir.2003).

---

[94] Id. (showing $9.5 million in North American sales at Merck in 2003)
[95] The "manifest disregard of the law" doctrine is a nonstatutory ground for vacatur of an arbitration award first recognized by the United States Supreme Court in Wilko v. Swan, 346 U.S. 427 (1953), and confirmed in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 656 (1985) and First Options of Chicago v. Kaplan, 514 U.S. 938, 942 (1995).

In concluding that Arentowicz did not carry his burden of demonstrating age discrimination, the Arbitrators ignored the clearly applicable United States Supreme Court decisions in <u>McDonnell Douglas</u> and <u>Burdine</u>. In <u>Burdine</u>, the Court held that in order to rebut the presumption of discrimination raised by the plaintiff's *prima facie* case, the employer "must clearly set forth, **through the introduction of admissible evidence**," a legitimate, nondiscriminatory reason for its actions. <u>Burdine</u>, 450 U.S. at 255. CGE&Y failed to come forward with any evidence supporting the legitimate, nondiscriminatory reason(s) it gave for terminating Arentowicz, i.e., immediate sales and revenue in 2003, thereby depriving Arentowicz of due process through a full and fair opportunity to demonstrate that the reason(s) was a pretext for discrimination. The Arbitrators knew of this governing legal principle under <u>Burdine</u> yet ignored it altogether. Accordingly, the Final Award was rendered in manifest disregard of the law and should be vacated.

**A.     <u>The McDonnell Douglas/Burdine Framework Is Clearly Applicable</u>**

**1.     The <u>McDonnell Douglas</u> burden shifting framework**

Sophisticated employers do not admit that an employee's age played a role in the termination decision. Employment discrimination cases thus suffer from "the difficulty that inheres in all state of mind cases – the difficulty of proving discriminatory intent through direct evidence, which is often unavailable." <u>Zive. v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 446 (2005). To address this difficulty, New Jersey[96] adopted the burden-shifting methodology articulated by the Supreme Court in <u>McDonnell Douglas</u>, 411 U.S. 792 (1973). <u>Visick v. Fowler Equip. Co.</u>, 173 N.J. 1 (2002). In <u>McDonnell Douglas</u>, the Court unanimously prescribed a "sensible, orderly way to evaluate the evidence" in a Title VII

---

[96] In the Final Award, the <u>full</u> Arbitration Panel ruled that New Jersey law applies to Arentowicz's claim of age discrimination. Arentowicz does not challenge this portion of the Final Award. McMoran Cert., Ex. H.

24

discrimination case, giving both the plaintiff and defendant fair opportunities to litigate. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).

Under the order of presentation of proof set forth in McDonnell Douglas, the plaintiff first has the burden of proving a *prima facie* case of discrimination. Id., at 802.[97] Once the plaintiff makes this showing, a mandatory presumption of discrimination is created. Burdine, 450 U.S. at 254. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden of production shifts to the defendant to rebut the presumption of discrimination by introducing evidence supporting a legitimate, nondiscriminatory reason for its actions. Id. If the employer is silent in the face of this presumption, judgment must be entered for the plaintiff. Id. Third, should the employer carry this burden, the plaintiff then has an opportunity to prove that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. Id., at 804.

An employee meets his ultimate burden of proving that age played a role in the employment decision by pointing to evidence during the third-step of the McDonnell-Douglas framework tending to show that the employer's proffered reason for terminating the employee is "unworthy of credence." Maiorino v. Schering Plough Corp., 302 N.J. Super. 323, 348-49 (App.Div.), cert. denied 152 N.J. 189 (1997). The employee is not required to show direct evidence of discrimination or other circumstantial evidence of

---

[97] Under the NJLAD, a plaintiff establishes a prima facie case of unlawful discrimination in a termination case by showing: (a) he belongs to a protected group or class; (b) was actually performing the job; (c) was discharged; and (d) the employer sought someone else to perform the same work after the termination, or that his job functions survived and a younger person(s) assumed the job functions. Zive, 182 N.J. at 446-50. There is no dispute that Arentowicz easily established a *prima facie* case of unlawful discrimination. McMoran Cert., Ex. D, pgs. 67-68. Arentowicz was fifty-four (54) years old at the time of his termination and therefore in a protected class. He had been performing his job at CGE&Y and its predecessor companies for over 23 years and was terminated. CGE&Y retained younger Vice Presidents in the reduction in force and Arentowicz's job duties were assigned to these younger Vice Presidents. Id.

discrimination. Greenberg v. Camden Vsc. Schools, 310 N.J. Super. 189, 199-200 (App. Div. 1998). Or, put differently, he is not required to show "pretext-plus." Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995); Maiorino, 302 N.J. Super. at 347. The factfinder may find intentional age discrimination from the falsity of the employer's proffered reason(s) for its actions and the evidence establishing the *prima facie* case alone. Reeves v. Sanderson Plumbing Prod Inc., 530 U.S. 133, 146-49 (2000).

### 2.    CGE&Y's burden of production under Burdine

The Supreme Court has repeatedly reaffirmed and refined the McDonnell Douglas framework, most notably in Burdine, 450 U.S. 248, another unanimous opinion. In Burdine, the Supreme Court held that under the second step of the McDonnell-Douglas framework, in order to rebut the presumption of discrimination raised by the plaintiff's *prima facie* case, the employer must come forward with admissible evidence supporting the legitimate, nondiscriminatory reason(s) articulated for its actions. Burdine, 450 U.S. at 255. "The explanation provided [by the employer] must be legally sufficient to justify a judgment for the [employer]." Id. An articulation not admitted into evidence will not suffice. Burdine, 450 U.S. at 256, n. 9.

An "inquiry into the adequacy of the [employer's] reason is very much a part of the McDonnell Douglas framework." Johnson v. Women's Christian Alliance, 76 F.Supp.2d 582, 586 (E.D.Pa.1999) (citations omitted). Burdine requires an employer to do more than simply state a reason for its actions, particularly when, as here, the employer claims that it terminated the employee based on objective measurements, i.e., sales projections. Indeed, to "articulate" a reason does not mean "to express in argument." Burdine, 450 U.S. at 255, n. 9. It means to produce evidence. Id. Thus, the employer cannot meet its burden merely through an answer to the complaint or by

argument of counsel. Id. Burdine requires the employer to articulate its reasons through testimony or other admissible evidence that is "clear and reasonably specific." 450 U.S. at 258. The employer's reasons must be "presented with sufficient clarity and detail to afford the plaintiff-employee a fair opportunity to pierce the proffered reasons with facts of record." Johnson, 76 F.Supp.2d at 586.

If the employer fails to satisfy its burden of production by coming forward with evidence supporting its articulated reason(s), particularly when objective, documentary evidence of the reason(s) exists, e.g., sales documents, then the employee is denied an opportunity to show that the reason articulated by the employer is a pretext, Burdine, 450 U.S. at 253-56, and it cannot be said that the employer met its burden of production. Postal Service Bd. of Governors v. Aiken, 460 U.S. 711, 716 (1983) (plaintiff must have adequate opportunity to demonstrate proffered reason was not the true reason for the employment decision but rather a pretext). The Court placed this burden of production on the employer because it recognized that it would be unfair and "utterly impractical to saddle the victims of discrimination with the burden of either producing direct evidence of discriminatory intent or eliminating the entire universe of possible nondiscriminatory reasons for a personnel decision." Hicks, 509 U.S. at 528-29 (dissent). This is particularly true in a case such as this where the employer has failed to produce in discovery the very documents that it claims would support its claimed termination reason.

The employer's burden of production serves simultaneously to present a legitimate reason for its actions and "to frame the factual issue with sufficient clarity so that the [employee] will have a full and fair opportunity to demonstrate" under the third step of McDonnell-Douglas that the employer's articulated reason for the termination is a pretext for discrimination. Id., at 255-256. The sufficiency of the employer's evidence

27

must be evaluated by the extent to which it fulfills these functions. <u>Id</u>. If the employer fails to satisfy its burden of production under <u>Burdine</u>, judgment must be entered for the employee as a matter of law. <u>Id</u>., at 254.

### 3. CGE&Y's burden of production under <u>McDonnell Douglas</u> is defined, explicit and clearly applicable

A legal principle clearly governs the resolution of an issue before the arbitrator if its applicability is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker</u>, 808 F.2d 930, 933 (2d Cir.1986). Here, the burden shifting framework set forth by the Court in <u>McDonnell Douglas</u> has "gained wide acceptance, not only in cases alleging discrimination on the basis of 'race, color, religion, sex or national origin' under Title VII, 42 U.S.C. §2000e-2, but also in similar cases, such as those alleging age discrimination under the Age Discrimination in Employment Act of 1967." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 526 (1993) (dissenting opinion) (citations omitted). There are a litany of reported federal and state court decisions in New Jersey and New York explicitly holding that the <u>McDonnell Douglas</u> burden shifting analysis applies in all discrimination cases brought under the NJLAD, <u>see</u> <u>e.g.</u>, <u>Erickson v. Marsh and McLennan Co.</u>, 117 N.J. 539, 550 (1990), and the New York Human Rights Law. <u>See</u> <u>e.g.</u>, <u>Ferrante v. American Lung Assn.</u>, 90 N.Y.2d 623, 629 (1997).

Indeed, it is difficult to imagine a more well-defined and clearly applicable standard in employment law than the <u>McDonnell Douglas</u> burden shifting methodology, which has stood for more than forty (40) years. <u>See</u> <u>e.g.</u>, <u>Stoddard v. Eastman Kodak Co.</u>, 2007 WL 952020 (W.D.N.Y.) (acknowledging that <u>McDonnell Douglas</u> framework is "well recognized").

### 4.     The Arbitration Panel was aware of <u>McDonnell Douglas</u>

The Arbitration Panel was well aware of CGE&Y's burden of production under <u>McDonnell Douglas</u>. Arentowicz set forth in detailed fashion in both his pre-hearing and post hearing briefs a description of the <u>McDonnell-Douglas</u> burden shifting methodology and of CGE&Y's burden under step-two of the framework, as refined in <u>Burdine</u>.[98] Arentowicz's counsel repeated the framework during opening arguments.[99] Since counsel communicated the governing legal principle orally and in writing to the arbitration panel, the court can infer that the panel had knowledge of that principle. <u>Four Seasons Software, LLC v. ICICI Infotech, Inc.</u>, 2006 WL 3791386 (D.Conn.) (citing <u>DiRussa v. Dean Witter Reynolds, Inc.</u>, 121 F.3d 818, 823 (2d Cir.1997)).

Moreover, Arbitrators Townley and Feliu are seasoned employment arbitrators and practitioners. Arbitrator Townley has been a full-time labor and employment arbitrator since 1986, was Chair of the Labor and Employment Section of the New York State Bar Association from 1999 to 2000, and "lectures widely on employment matters."[100] Arbitrator Feliu, a partner in Vandenberg & Feliu, LLP, devotes "100% of his practice to employment law matters" and served as Editor-in-Chief of New York Employment Law & Practice from 1999 to 2004.[101] Given the Arbitrators extensive experience in employment law, there can be no doubt that they are aware of the legal principles set forth by the Supreme Court in the <u>McDonnell Douglas</u> decision.

---

[98] McMoran Cert., Ex. A, pgs. 30-35; Ex. D, pgs. 66-70
[99] McMoran Cert., Ex. C, Tr.28:7-47:23
[100] McMoran Cert., Ex. J
[101] McMoran Cert., Ex. K

### B.    The Arbitrators Manifestly Disregarded CGE&Y's Burden Of Production Under McDonnell Douglas And Burdine

In rendering the Final Award of April 4, 2007 denying Arentowicz's age claim, Arbitrators Townley and Feliu manifestly disregarded CGE&Y's burden of production under McDonnell Douglas and Burdine and ruled in favor of CGE&Y despite its complete failure to introduce any admissible evidence supporting its claimed legitimate, nondiscriminatory reason for terminating Arentowicz's employment.

### 1.    CGE&Y introduced no admissible evidence of the reason for Arentowicz's termination

For over two years, from December 2002 until February 2005, CGE&Y refused to articulate any reason for the termination of Arentowicz's employment. CGE&Y ignored Arentowicz's December 12, 2002 e-mail to Wilson pleading for some explanation as to why he had been terminated after twenty-three years of service, and refused to answer Arentowicz's Interrogatory No. 6, which simply asked CGE&Y to set forth the reason he was fired. CGE&Y responded to Interrogatory No. 6 by stating that it was "inappropriate in the context of arbitration."

If this case were in court rather than arbitration, Arentowicz could have successfully moved to strike CGE&Y's answer and defenses based on its refusal to articulate a reason for the termination decision in response to Interrogatory No. 6. That option was not available to Arentowicz in arbitration. Recognizing this fact, CGE&Y cleverly attempted to use the arbitration forum to its advantage by refusing to answer Arentowicz's interrogatories, which deprived Arentowicz of a full and fair opportunity to show pretext at the third-step of McDonnell Douglas. In essence, CGE&Y thumbed its nose at Arentowicz and the arbitration process. It is well settled, however, that the resolution of claims through arbitration is only appropriate when "the prospective litigant

30

effectively may vindicate [his or her] statutory right in the arbitral forum." <u>Gilmer v.</u> <u>Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 28 (1991). To that end, the Supreme Court in <u>Gilmer</u> noted that arbitral discovery must be adequate to give plaintiffs "a fair opportunity to present their claims." <u>Gilmer</u>, <u>supra</u>, 500 U.S. at 31. CGE&Y deprived Arentowicz of a "fair opportunity" to litigate his age claim by refusing to give <u>any</u> reason for his termination for over two years.

Moreover, in February 2005, CGE&Y finally produced a document (Exhibit R-13) showing the alleged termination reason. CGE&Y relied on this reason in defense of Arentowicz's age claim until February 2006 when David Wilson testified at his deposition that Exhibit R-13 was false and did not identify the real reason Arentowicz was fired. Wilson claimed Arentowicz was fired due to a lack of "immediate revenue generation or sales opportunities."[102] However, CGE&Y failed to come forward with a shred of admissible evidence at the hearing supporting this claim, let alone evidence that was presented with sufficient clarity and detail such that Arentowicz would be given a full and fair opportunity to pierce CGE&Y's proffered reason with evidence in the record. <u>Burdine</u>, 450 U.S. at 258. CGE&Y introduced no evidence of Arentowicz's sales numbers into the record. CGE&Y did not produce a single document that even remotely referenced its alleged reason for terminating Arentowicz. Unbelievably, it claimed no such documents exist.[103] CGE&Y did not produce any document showing the comparative analysis Wilson performed during several alleged meetings with his executive team. There are no documents showing that these meetings even took place, i.e., notes, memos, minutes, agendas, e-mails, etc. In fact, two (2) members of the

---

[102] McMoran Cert., Ex. C, Tr.290:19-291:2
[103] Arentowicz Ex. R-10, Jadick Dep., T26:6-27:11; McMoran Cert., Ex. C., Tr.293:25-294:7

executive team deny that they had any involvement in the decision to terminate Arentowicz.[104]

CGE&Y failed to proffer a single document showing Arentowicz's projected sales and/or revenue for 2003, including the "sales pipeline documents" from August to December 2002 that Wilson allegedly relied upon in selecting Arentowicz for termination. CGE&Y's entire defense that Arentowicz did not have significant projected sales in 2003 was based on information contained in these documents. CGE&Y had sole possession of the pipeline documents, which would have proved or disproved the termination reason CGE&Y articulated, and was aware as early as May 2003 of the need to maintain this information. Nevertheless, CGE&Y failed to produce the documents during discovery or at the arbitration hearing. CGE&Y produced only a sales pipeline document from January 2003, which obviously had no probative value since Arentowicz had been gone from CGE&Y for over one month by that time. The Arbitration Panel properly excluded the document from evidence.

Further, not one CGE&Y witness offered any testimony at the arbitration hearing disputing Arentowicz's sales through September 2002 ($7.3 million) or his 2003 sales projection of $9.5 million at Merck. Not one CGE&Y witness even had knowledge of Arentowicz's sales projections in 2003. Thus, it is not just that CGE&Y failed to proffer documents showing Arentowicz's sales numbers, CGE&Y also failed to present any oral testimony regarding his sales. Laurie Jadick testified that she had no knowledge of the sales and/or revenue Arentowicz was expected to generate in 2002 and/or 2003.[105] David Wilson, the alleged decisionmaker, admitted that he never reviewed Arentowicz's sales

---

[104] McMoran Cert., Ex. C, at Tr.92:13-15, Tr.594:17-19
[105] McMoran Cert., Ex. C, Tr.303:22-304:5

32

or revenue targets for 2002, was not aware if Arentowicz met those targets, and did not know Arentowicz's sales projections for 2003.[106]

In order to meet the <u>Burdine</u> standard, CGE&Y was required to adduce at least some evidence of the sales numbers it allegedly relied upon in terminating Arentowicz's employment. It failed to do so. The complete absence of any documents or testimony from CGE&Y regarding Arentowicz's sales deprived him of a full and fair opportunity to challenge CGE&Y's stated reason. He was precluded from pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in CGE&Y's claimed termination reason which rendered it "unworthy of credence." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir.1994); <u>Burdine</u>, 450 U.S. at 255. In short, CGE&Y's tactics in discovery and at the hearing deprived Arentowicz of due process. Arentowicz had no evidence to challenge at the third-step of the <u>McDonnell Douglas</u> framework to show that CGE&Y's articulated reason for his termination was a pretext for discrimination because CGE&Y failed to introduce any evidence to meet its burden of production. <u>Murray</u>, 311 N.J. Super. at 176 (employer failed to satisfy burden of production where it produced no evidence of how termination decision was made).

CGE&Y's total lack of proof on the issue of Arentowicz's sales numbers "[has] no more significance than if [it] had remained silent. <u>Murray v. Newark Housing Authority</u>, 311 N.J. Super. 163, 176-77 (L.Div.1998) (citing <u>Hicks</u>, <u>supra</u>, 509 U.S. at 509). In this regard, the Award eviscerates the central purpose of the burden shifting methodology devised by the Court in <u>McDonnell Douglas</u> by making it harder - not easier - for a plaintiff to show an employer's discriminatory intent through circumstantial evidence of pretext in the absence of direct, smoking gun evidence, which rarely if ever

---

[106] McMoran Cert., Ex. C, Tr.345:2-346:17, Tr.384:10-20

exists. Burdine, 450 U.S. at 256 (plaintiff "must have the opportunity to demonstrate" pretext); McDonnell Douglas, 411 U.S. at 85; U.S. Postal Service Bd. of Gov. v. Aikens, 460 U.S. 711, 716, n. 5 (1983).

The only evidence of sales produced in discovery or at the hearing came from Arentowicz in the form of his 2002 performance review[107] and 2003 sales projection document for Merck,[108] both of which were admitted into evidence. These documents were supported by Arentowicz's oral testimony and showed that he was on pace to generate $10 million in total sales in 2002, with projected sales of $9.5 million at Merck in 2003, which more than doubled the amount CGE&Y claimed it expected a Vice President to generate to be safe from termination, i.e., $3 to $5 million.[109]

Arentowicz could not have provided more "specific and convincing evidence" that he would generates sales "in the months following the RIF," as the Arbitrators suggest,[110] because the only other evidence available, i.e., the sales pipeline documents, was in the sole and exclusive possession of CGE&Y and was withheld by CGE&Y. By rejecting Arentowicz's age claim because he was unable to produce this information - which was outside of his control - the arbitrators rewarded CGE&Y for remaining silent in the face of its burden of production under McDonnell Douglas and deprived Arentowicz of the full and fair opportunity to demonstrate pretext that the Court in Burdine mandated.

As previously noted, Burdine holds that the sufficiency of the employer's evidence is to be judged by whether it frames the factual issues with enough clarity that

---

[107] Arentowicz Ex. R-5, CG0064
[108] Arentowicz Ex. R-6
[109] Arentowicz Ex. R-5, Ex. R-6
[110] McMoran Cert., Ex. H, p. 3

34

they can be met by plaintiff. Id. Because CGE&Y's evidence fails to meet this requirement, it is insufficient as a matter of law to meet the burden of production placed on it under McDonnell Douglas. As a result, the presumption of discrimination that arose upon Arentowicz's presentation of a *prima facie* case remains unrebutted and a finding of intentional discrimination on the basis of age in violation of the NJLAD is mandated as a matter of law. Burdine, 450 U.S. at 254; Reeves, 530 U.S. at 147. Once CGE&Y failed to discharge its McDonnell Douglas burden of production, discrimination became the "most likely explanation" since CGE&Y was in the "best position" to come forward with admissible evidence supporting the actual reason(s) for its actions. Id.

### 2.     Arbitrator Maltby recognized CGE&Y's failure to support its articulated reason for terminating Arentowicz

CGE&Y's failure to satisfy its burden of production was "so obvious that it would be instantly perceived by the average person qualified to serve as an arbitrator." Willemijn v. Standard Microsystems, 103 F.3d 9, 13 (2d Cir.1997). Indeed, in his Dissenting Opinion, Arbitrator Maltby properly recognized the significant deficiencies in CGE&Y's defense and explained, at length, that:

> [CGE&Y's] articulated non-discriminatory reason for the termination is that Arentowicz's projected revenue was not sufficient. It argued that vice presidents needed to have projected revenue of $3 to $5 million to retain their jobs and that the projected revenue of Arentowicz's account were below this figure . . . **[CGE&Y] submitted virtually no evidence to support this position.** It could have introduced the revenue projections (called "pipeline documents") for Arentowicz and the other vice presidents. It is undisputed that these documents existed. [CGE&Y] has not produced these documents, nor has it given an adequate explanation for their absence. Rather it attempts to place the blame for their absence on Arentowicz. Next [CGE&Y] argues that it had no way of knowing that these documents needed to be retained. In

35

support of this argument it points to the date it received the complaint, almost one year after the termination. [CGE&Y] fails to mention, however, that it received a demand letter from Arentowicz's attorney in April 2003, only four months after the termination.[111]

. . . . . . . . . . . . . .

  In the absence of the pipeline documents themselves, [CGE&Y] could have provided oral testimony regarding its revenue projections, especially the projection for Arentowicz, and explained why it was more realistic than Arentowicz's own projection . . . **[CGE&Y] did not provide this evidence either.** Its principal witness was David Wilson, Arentowicz's former supervisor who made the termination decision. Wilson admitted that he did not remember Arentowicz and Gray's revenue projection (even approximately), his own revenue projection for Arentowicz, or why Arentowicz's projection was overly optimistic. Indeed, it is difficult to see how Wilson could have made such a determination. By his own admission, he was new to the Life Sciences division and had not had time to acquire significant personal knowledge of the division and its clients. Nor did he ever speak to Arentowicz about the revenue he projected in order to gauge its reasonableness. Nor did he speak to anyone at Merck, which represented the vast majority of the revenue Arentowicz generated, or any of Arentowicz's other clients. Nor does the record reflect any other means by which Wilson received information that would differ from the projection submitted by Arentowicz. It is difficult to believe that Wilson acted on the basis of information the record indicates that he did not have.[112]

. . . . . . . . . . . . . .

It is true that Wilson testified at length regarding the process by which he claims the termination decisions were reached. None of this testimony, however, indicates that Wilson had any source of information about the revenue Arentowicz would generate other than the Arentowicz/Gray

---

[111] Id., at p. 5
[112] Id., at pgs. 5-6

projection[113] and Merck's past business with [CGE&Y], both of which indicated that Arentowicz would produce enough revenue to be retained.[114]

### 3. Arbitrators Townley & Feliu disregarded CGE&Y's burden of production under McDonnell Douglas

Despite rejecting Arentowicz's age claim, the Arbitrators recognized CGE&Y's failure to satisfy its burden of production under McDonnell Douglas. Arbitrators Townley and Feliu state in the Final Award that CGE&Y's "failure to timely produce documentation related to the forecasted business production of the individual vice presidents in Life Sciences . . . [was] troubling and weigh[s] in favor of Arentowicz's claim."[115] The problem with the Award lies in the fact that the Arbitrators turned a blind-eye to the significance of this failure. In so doing, they acted in manifest disregard of more than a quarter century of well-defined, explicit and clearly applicable law set forth in McDonnell Douglas, Burdine, and virtually every case since these decisions.

The Arbitrators failed to recognize that CGE&Y's decision not to "produce documentation related to [ ] forecasted business production" was fatal to its case. Indeed, CGE&Y's inability and/or refusal to satisfy its burden of production under McDonnell Douglas by producing evidence supporting its claimed termination reason was not simply a factor to be considered by the Arbitrators in deciding Arentowicz's age claim. It is a required element under McDonnell Douglas which, if not satisfied, compels judgment as a matter of law for the plaintiff. Burdine, 450 U.S. at 254; Murray 311 N.J. Super. at 176. Burdine mandates that result because, by failing to come forward with the sales pipeline

---

[113] This is referring to Exhibit R-6, and the revenue projections Arentowicz prepared for Merck in 2003 in connection with Merck's consideration as a GSU account. These projections show projected sales at Merck North America in 2003 of $9.5 million.

[114] Id., at p. 6

[115] McMoran Cert., Ex. H, p. 3

documents, or other evidence, that would have proved or disproved its legitimate, nondiscriminatory reason for terminating Arentowicz, CGE&Y deprived Arentowicz of a full and fair opportunity to demonstrate under the third step of <u>McDonnell Douglas</u> that CGE&Y's articulated reason for the termination was a pretext. <u>Burdine</u>, 450 U.S. at 256 (plaintiff "must have the opportunity to demonstrate" pretext);

By ignoring this critical function of the second-step in the <u>McDonnell Douglas</u> framework, the Arbitrators transformed CGE&Y's burden of production "from a device used to provide notice and promote fairness into a misleading and potentially useless ritual." <u>Hicks</u>, 509 U.S. at 534 (dissent). Indeed, of what use to an employee is an employer's articulated reason(s) for its actions if the employer is not required to produce any evidence, documentary or otherwise, from which the employee could prove that the reason(s) is a pretext for discrimination? This is especially true when the claimed reason is based on numerical criteria (i.e., sales numbers) and the numbers are solely in the possession of the employer.

The Arbitrator's decision leads to the perverse result that employers who fail to articulate any reason in discovery, and fail to produce admissible evidence at the hearing supporting the nondiscriminatory reason(s) for their own termination decisions, will actually be in a better position than those employers who, in good faith, produce evidence supporting their actions. Since the employer knows the true reason for its actions, and is in control of all of the information relating to its actions, by producing nothing, an employer can eliminate any opportunity the plaintiff may have at the third step of the <u>McDonnell Douglas</u> framework to prove that the articulated reason is a pretext. In the absence of evidence supporting the termination reason, there is nothing for the plaintiff to challenge to show pretext. As such, the Award destroys "a framework carefully crafted in

precedents" as old as 40 years, <u>Hicks</u>, 509 U.S. at 540 (dissent), by allowing CGE&Y to turn the shield of its stonewalling tactics into a sword to defeat Arentowicz's age claim. This outcome makes a mockery of <u>McDonnell Douglas</u> and <u>Burdine</u>.

## **CONCLUSION**

At the conclusion of the arbitration, the Arbitrators were left with the following:

- CGE&Y refused to articulate a reason for its actions in response to Arentowicz's interrogatories.

- CGE&Y did not produce any evidence which accurately depicted the reason Arentowicz was fired or the comparative analysis Wilson allegedly performed in selecting Arentowicz for termination.

- CGE&Y did not proffer any documents, testimony or other evidence showing Arentowicz's sales numbers in 2002 and/or 2003.

- CGE&Y did not produce any documents, testimony or other evidence that Arentowicz did not have sufficient sales, i.e., $3 to $5 million, to justify his retention in the reduction-in-force.

- CGE&Y withheld the only documents in existence that would have shown Arentowicz's projected sales in 2003, i.e., the sales pipeline documents.

- The only evidence in the record of Arentowicz's sales in 2002/2003 came from Arentowicz. That evidence, which CGE&Y did not dispute, showed that Arentowicz had more than double the sales in 2002 ($7.3 million through September 2002, with $10 million in projected sales) and 2003 ($9.5 million projected) necessary to be safe from termination under the standards CGE&Y articulated ($3 to $5 million).

Based on these undisputed facts (a) CGE&Y did not satisfy its burden of production under <u>McDonnell Douglas</u> because it failed to come forward with "clear and

reasonably specific" evidence supporting its claimed reason for terminating Arentowicz and, as such (b) deprived Arentowicz of due process by failing to give him a full and fair opportunity to show with facts in the record that the proffered reason was a pretext for discrimination. All three (3) Arbitrators recognized this defect in CGE&Y's case, but only Arbitrator Maltby properly recognized its significance. Arbitrators Townley and Feliu incorrectly considered CGE&Y's failure to satisfy its burden of production as merely a factor to be considered in the <u>McDonnell Douglas</u> framework, rather than a fatal flaw. In so doing, the Arbitrators manifestly disregarded the well-recognized mandate in <u>Burdine</u> that judgment must be entered for the employee as a matter of law if the employer fails to satisfy its burden of production. <u>Burdine</u>, 450 U.S. at 254. Arbitrators Townley and Feliu knew about and appreciated the requirements of <u>McDonnell Douglas</u> and <u>Burdine</u> yet manifestly disregarded them.

Accordingly, the Award should be vacated and remanded to the Arbitration Panel with instructions to: (a) find in favor of Arentowicz on his NJLAD claim as a matter of law; and (b) determine damages.

Respectfully submitted,

McMORAN, O'CONNOR & BRAMLEY, P.C.
Attorneys for Petitioner, Charles Arentowicz

By: _s/ Bruce P. McMoran_____
    BRUCE P. McMORAN (BM1809)

Dated:    September 10, 2007

40

# UNPUBLISHED DECISIONS

Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

Four Seasons Software, LLC v. Icici Infotech, Inc.
D.Conn.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
FOUR SEASONS SOFTWARE, LLC, Plaintiff,
v.
ICICI INFOTECH, INC., Defendant.
**Civil Action No. 3:05cv171 (SRU).**

Dec. 22, 2006.

Matthew A. Sokol, Tyler, Cooper & Alcorn, New
Haven, CT, Michael T. McCormack, Tyler Cooper
& Alcorn, Hartford, CT, for Plaintiff.
Douglas R. Weider, Greenberg Traurig, LLP,
Florham Park, NJ, Jeffrey R. Mann, Robert A.
Horowitz, New York, NY, Steven M. Greenspan,
Day, Berry & Howard, Hartford, CT, for Defendant.

### RULING ON CROSS-MOTIONS TO CONFIRM OR VACATE ARBITRATION AWARD

STEFAN R. UNDERHILL, United States District
Judge.

**\*1** This case involves, in essence, a breach of
contract dispute. I stayed the case in May 2005,
while the parties arbitrated their claims. In July
2006, an arbitration panel ("the panel") issued a
decision assigning liability to ICICI Infotech, Inc. ("
ICICI") and awarding Four Seasons Software, LLC (
"FSS") $2,040,000 damages. Subsequently, the
parties filed cross-motions asking me either to
confirm or vacate the award of damages. ICICI does
not challenge the panel's decision with respect to
liability, and does not oppose my confirming a
damages award of $235,000 in favor of FSS. *See*
Defendant's Memorandum at 2 n. 1.

The narrow issue before me, therefore, is whether to
confirm or vacate the panel's award of $1,805,000,
which reflects the panel's award of damages in an
amount equal to its valuation of FSS as of
December 31, 2004. ICICI complains that this

aspect of the award constituted a "manifest
disregard of the law," and that I should therefore
vacate that award. For the reasons discussed below,
I disagree.

### I. Background

FSS was a Connecticut-based startup company
founded in 2002 to develop a software program ("
4S software") that would facilitate online and
mail-order shopping. ICICI is the subsidiary of a
major software development company and is
headquartered in India. On November 19, 2002,
FSS and ICICI entered into a Master Service
Agreement and a Statement of Work that, in
essence, reflected a development partnership
between the two entities. In exchange for its work
developing the 4S software product, ICICI was to
receive a cash payment of $450,000, and certain
royalties, intellectual property rights, and an equity
stake in FSS. The agreements also provided that
Connecticut law would govern any dispute between
the parties.

In March 2004, the two parties amended the
agreement. The amendment provided in relevant
part that FSS would pay ICICI $600,000 rather than
$450,000, and ICICI would release the source code
to FSS once FSS had paid $450,000. Subsequently,
the parties began to disagree about project delays
and expenses. Ultimately, the parties could not
work out their differences, and they stopped
working together. FSS demanded that ICICI turn
over the source code of the 4S software. ICICI
refused.

FSS filed a replevin action in Connecticut state
court to recover the source code, and in January
2005, ICICI removed the case to this court. In May
2005, I stayed the case while the parties arbitrated
the dispute. On July 14, 2006, the panel issued an
arbitration award finding that ICICI had breached
its agreement with FSS subsequent to the March

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 2

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

2004 amendment. The agreement limited damages to the amount FSS paid ICICI, $235,000, unless ICICI committed "willful misconduct." The panel concluded that ICICI committed willful misconduct, and as a result, awarded FSS an additional $1.805 million. The panel's amended grants FSS a total of $2,040,000. *See* Plaintiff's Exhibits D and E.

## II. Discussion

**\*2** ICICI has not shown that the panel manifestly disregarded the law. The panel did not ignore or refuse to apply the controlling legal principle established in *Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin*, 247 Conn. 48, 67-70 (1998), that an award of damages for the destruction of an unestablished enterprise may be based upon lost profits, provided the plaintiff presents "sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty."

### A. *Standard of Review*

#### 1. *"Manifest Disregard of Law" Overview*

Judicial review of arbitration awards is "extremely limited." *See, e.g., Bear, Stearns & Co. v. Ontario*, 409 F.3d 87 (2d Cir.2005); *Wallace v. Buttar*, 378 F.3d 182 (2d Cir.2004); *Duferco International Steel Trading v. Klaveness*, 333 F.3d 383 (2d Cir.2003). There are four statutory grounds for vacating an arbitration award, which principally address fraud or corruption of the arbitrators; the statutory grounds do not apply here.[FN1] In addition, there is a judicially-created basis for vacating an arbitration award when the award "exhibits a manifest disregard of law." *S ee, e.g., Duferco*, 333 F.3d at 388 (citing *Wilko v. Swan*, 346 U.S. 427 (1953)).

> FN1. *See Duferco*, 333 F.3d at 388 n. 1 (citing 9 U.S.C. § 10(a)) (allowing vacatur of arbitration awards where (1) the award was procured by fraud; (2) there was evidence of corruption of the arbitrators;

(3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their powers).

The party seeking to vacate the arbitration award bears the burden of proving manifest disregard of law. *Wallace*, 378 F.3d at 189. ICICI complains that the panel's decision awarding FSS damages reflecting the value of FSS constitutes a manifest disregard of law. ICICI "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Id.* (citing *Duferco*, 333 F.3d at 388).

The reach of the manifest disregard of law doctrine is "severely limited." *Id. See also Bear, Stearns*, 409 F.3d at 90. "[O]btaining judicial relief for arbitrators' manifest disregard of the law is rare." *Duferco*, 333 F.3d at 389. A review of the case law confirms that conclusion. In *Duferco*, the Second Circuit calculated that, between 1960 and 2003, that Court applied the "manifest disregard of law" standard 48 times, and only vacated an arbitral award four times. *Id.* Of those four vacaturs, three were arguably based on statutory grounds rather than the "manifest disregard of law" doctrine. *Id.* Following the one case, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir.1998), in which the Court expressly vacated the arbitral award based on "manifest disregard of law," the Court subsequently cautioned the district courts not to read *Halligan* too broadly, because it was a limited decision reflecting unique policy concerns. *See Wallace*, 378 F.3d at 192 (responding to district courts' reliance on *Halligan* in vacating arbitration awards); *GMS Group, LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir.2003).

The "manifest disregard of law" doctrine is a " doctrine of last resort-its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Wallace*, 378 F.3d at 189 (quoting *Duferco*, 333 F.3d at 389). Courts must give great deference to arbitrators, because interfering with the arbitration process would "frustrate the intent of the parties," and would undermine the usefulness and finality of arbitration. *See Duferco*, 333 F.3d at 389

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 3

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

. The Second Circuit has "often explained that ' arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.' " *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997) (citing *Willemijn v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997)).

### 2. *"Manifest Disregard of Law Test" and How to Apply It*

**\*3** To demonstrate that the panel manifestly disregarded the law, ICICI must prove that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable. *Wallace,* 378 F.3d at 189; *Halligan,* 148 F.3d at 202.FN2 A court may not vacate an arbitration award because it thinks the arbitrators made the wrong decision. *Wallace,* 378 F.3d at 190. Indeed, even if the court thinks that the arbitrator reached the wrong result or applied the law incorrectly, the court should nevertheless confirm the award, "despite [the] court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *Id.* (emphasis in original). That is true even if confirmation of the arbitrators' reasoning " would be based on an error of fact or law." *GMS Group,* 326 F.3d at 78. The manifest disregard of law doctrine justifies vacating an arbitration award only in the "most egregious instances of misapplication of legal principles." *Wallace,* 182 F.3d at 189.

> FN2. Sometimes the test is formulated as a three-prong test: (1) the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators; (2) the law was in fact improperly applied, leading to an erroneous outcome; and (3) the arbitrators actually knew about the law and its applicability to the issues before them. *Duferco,* 333 F.3d at 389-90.

The Second Circuit has recognized that, although the manifest disregard of law test is well established, application of the test is unclear. *See Duferco,* 333 F.3d at 389 ("Perhaps we so infrequently find manifest disregard, its precise boundaries are ill defined, although its rough contours are well known."); *GMS Group,* 326 F.3d at 77 ("Over time we have stated many, varied formulations of the manifest disregard standard in an attempt to give it better definition."). The problem arises how to distinguish between intentional ignorance or refusal to apply controlling law and unintentional misinterpretation or misapplication of the law to the facts. There is usually no direct evidence whether an arbitration panel knowingly ignored or refused to apply controlling law. Arbitrators are not required to explain their decisions. *Bear, Stearns,* 409 F.3d at 91. Thus, "the reviewing court must attempt to infer from the record whether the arbitrators appreciated and ignored a clearly governing legal principle." *Id.*

A reviewing court's authority to review the record is limited. That is because "the Second Circuit does not recognize manifest disregard of the *evidence* as proper ground for vacating an arbitrator's award." *Wallace,* 378 F.3d at 193 (quotation omitted) (emphasis supplied). Rather, the Second Circuit recognizes the doctrine of manifest disregard of the *law,* which requires courts to confirm arbitration awards "in all but those instances where there is no colorable justification for a conclusion." *Id.* Therefore, a reviewing court may consider the evidentiary record only insofar as it bears upon the question whether there was a colorable justification for the panel's conclusion; a reviewing court may not "conduct a reasoned assessment of the evidentiary record." *Id.*

### B. *Whether the Panel's Decision Constituted Manifest Disregard of Law*

**\*4** Application of the "manifest disregard of law" standard requires me to make, in essence, three inquiries that I address in the following order: (1) whether the legal principle allegedly ignored by the arbitrators was well-defined, explicit, and clearly applicable; (2) whether the arbitrators knew of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

governing legal principle; and (3) whether, knowing that principle, the arbitrators refused to apply it or ignored it. *Wallace,* 378 F.3d at 189; *Halligan,* 148 F.3d at 202.

*1. Whether the Governing Legal Principle Was Clearly Established*

The parties do not dispute that the law was well-defined, explicit, and clearly applicable. The relevant legal principle governs the calculation of damages for destruction of a nascent, or undeveloped, business. In *Beverly Hills,* the Connecticut Supreme Court held that undeveloped businesses may be awarded damages to compensate them for the destruction of the business. The Court also held that one way to calculate damages for destruction of an undeveloped enterprise is to estimate the present value of a stream of expected future profits. *Beverly Hills,* 247 Conn. at 63. A trier of fact may only award such damages, however, if the plaintiff presents "sufficiently accurate and complete evidence for the trier of fact to be able to estimate those [damages] with *reasonable certainty.*" 247 Conn. at 68-70 (emphasis supplied). Damages do not need to be proven "with mathematic certainty" or with " exactitude," b ut "the plaintiff cannot recover for ' the mere possibility' of making a profit." *Id.* at 69-70 (citation omitted). "The determination of damages involves a question of fact...." *Lawson v. Whitey's Frame Shop,* 241 Conn. 678, 690 (1997).

The *Beverly Hills* court delineated several factors for the trier of fact to apply to calculate whether damages for lost profits have been proven with reasonable certainty: (1) the plaintiff's prior experience in the same business; (2) the plaintiff's experience in the same enterprise subsequent to the interference; (3) the experience of the plaintiff in a similar business; (4) the average experience of participants in the same line of business as the injured party; and (5) pre-litigation projections of profits, especially when prepared by the defendant. *Id.* at 73-74. The overarching concern, no matter what type of evidence is submitted, is that there be a "substantial similarity between the facts forming the basis of the profit projections and the business

opportunity that was destroyed." *Id.* at 74. *See also Cheryl Terry Enterprises, Ltd. v. City of Hartford,* 270 Conn. 619, 640 (2004).

The *Beverly Hills* decision does not require the trier of fact to apply a particular methodology in calculating damages for future lost profits. *See Beverly Hills,* 247 Conn. at 68-70. What is required is that the plaintiff present enough evidence of sufficiently reliable accuracy from which the trier of fact can estimate future lost profits with reasonable certainty. Although the legal principle that the trier of fact calculate future lost profits to a reasonable certainty is well-defined, that principle does not necessarily compel a particular conclusion. Rather, the principle necessarily calls for the use of discretion in applying the guiding principle to the evidence, as illustrated by the fact that the Connecticut Supreme Court urged triers of fact to consider numerous factors in reaching a decision.

*2. Whether the Panel Knew of the* Beverly Hills *Principle*

**\*5** It is undisputed that counsel made the panel aware of the governing legal principle.

In this case, both sides communicated the relevant legal principle to the panel by citing to the *Beverly Hills* decision and quoting the relevant language. *See* Defendant's Exhibit B at 49 (citing *Beverly Hills* for the proposition that damages for lost profits must be proven to a "reasonable certainty"); Defendant's Exhibit C at 32 (delineating factors to be considered and stressing that the estimate must be reasonable, but not using the words "reasonable certainty"); Defendant's Exhibit E at 7 (arguing that, pursuant to *Beverly Hills,* FSS had met its burden of proving damages with "reasonable certainty").

"[A] court reviewing an arbitral award cannot presume that the arbitrator is capable of understanding and applying legal principles with the sophistication of a highly skilled attorney." *Wallace,* 378 F.3d at 190. Rather, the court must assume the arbitrator to be a "blank slate unless educated in the law by the parties." *Id.* (quotation omitted). A fair reading of the relevant cases suggests that, if the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.