Slip Copy                                                                                                    Page 5

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

lawyers communicate the governing legal principle orally or in writing to the panel, the reviewing court can infer that the arbitrators had knowledge of that principle. *See DiRussa,* 121 F.3d at 823.

### 3. Whether the Panel "Ignored" or "Refused to Apply" the Beverly Hills *Principle*

This is not a case where "some egregious impropriety on the part of the arbitrators is apparent." *See Wallace,* 378 F.3d at 189 (describing the limited reach of the manifest disregard of law doctrine). Rather, the panel's decision reflects that it conducted a reasoned, careful analysis, and attempted to apply the governing legal standard to the evidence to calculate the damages award. The panel provided much more than "a barely colorable justification" for its damages award, because the panel considered some of the *Beverly Hills* factors and applied those factors to the evidence. A panel's failure to understand the law or to apply it appropriately is not enough to vacate the panel's decision; there must be more, in essence, the intent to reach a particular result irrespective of what the law requires. *See GMS Group,* 326 F.3d at 77. At most, ICICI has proven that the panel misinterpreted or misunderstood the *Beverly Hills* standard; that is not manifest disregard of law. *See Wallace,* 378 F.3d at 189-90; *Duferco,* 333 F.3d at 389 (citing *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 208 (2d Cir.2002)).

#### a. The Panel's Decision Regarding Damages

The panel explained how it arrived at its damages award over about seven pages in a 28-page written decision. *See* Plaintiff's Exhibit D at 20-27. The panel recognized the crucial issue, how to value FSS's business prospects, in light of the fact that the panel found that ICICI had extinguished those prospects. *Id.* at 21. The panel certainly recognized that valuing future business prospects, particularly for a start-up business, is a difficult endeavor. *Id.* at 21. The panel did not, however, indicate that it could not reasonably estimate FSS's value; the panel's process of culling and weighing the evidence, as reflected in its written decision,

demonstrates it could.

*6 The panel's "starting point" was ICICI's pre-litigation valuation of FSS. *Id.* at 22-24; *cf. Beverly Hills,* 247 Conn. at 74 (delineating this factor as a proper consideration in calculating damages). Prior to litigation, ICICI and its experts had valued its eight percent share in FSS at $480,000, which results in a value of $6 million for the entire company. ICICI adopted that value on its books for use in making a public offering in 2005. The panel noted that ICICI's valuation was "similar" to the $5.8 million valuation calculated by plaintiff's expert, Dr. Stephenson. Plaintiff's Exhibit D at 22 (citing 3i Ex. 546). The panel did not simply adopt Dr. Stephenson's valuation, however, because his valuation was "fundamentally based on FSS sales and operating assumptions which the panel finds are questionable." *Id.*

The panel noted that it was "unable to credit fully the testimony of any of the financial experts presented." *Id.* The experts provided information "helpful" to the panel, but "none of the experts ... considered the evidence assuming an actual introduction of the Beta in 2005 with the marketing release to follow in 2006." *I d.* Because no expert employed the assumptions the panel found appropriate, the panel did not accept the valuation proposed by either expert. Instead, based on various factors, including market structure, product pricing, competitive advantages and disadvantages of the 4S software, difficulty of market entry, and the need for an attractive legacy import system, the panel concluded that the valuation of $859,140 prepared by defendant's expert, Spadea, was "more appropriate" than Stephenson's. *Id.* at 24.

Still, the panel did not end its analysis by accepting the value for FSS proposed by defendant's expert. Rather, the panel applied its own discount rate, in place of the 80% figure used by defendant's expert. *See* Defendant's Exhibit F (3i Ex. 547). In doing so, the panel took account of other evidence in the record. For example, the panel noted that FSS was a "thinly capitalized business" in a market that was difficult to penetrate and that was dominated by another entity. The panel also considered FSS's delay in entering the marketplace and loss of initial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 6

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

sales for which ICICI had no liability. Plaintiff's Exhibit D at 22.

The panel also considered evidence of FSS's strengths. The panel noted the relatively successful experiences of other participants in the same line of business as FSS. *Id.* at 23; *see also Beverly Hills,* 247 Conn. at 73-74 (delineating this as another appropriate factor). Furthermore, the panel determined that ICICI had an equity investment in FSS and that ICICI viewed the 4S software product favorably. *Id.* at 21-22. The panel also considered the viability of the product and the fact that FSS was able to secure investors. *Id.* at 21. The panel recognized that "FSS had value," and considered that FSS had a "capable management team" in place. *Id.* FSS offered a product for which there was a demonstrated need. *Id.*

*7 In sum, the panel considered ICICI's valuation of FSS and the valuations prepared by both experts. The panel did not accept any of those valuations wholesale; it considered the record evidence, including evidence concerning factors that *Beverly Hills* approved when calculating damages. There is nothing to suggest that this careful, balanced approach was tainted by the panel's adoption of assumptions it criticized as questionable.

b. Whether There is a "Barely Colorable Justification" For the Panel's Decision

ICICI argues that, because the panel indicated in its written decision that some of the assumptions on which Stephenson's valuation was premised were "questionable," the panel's entire methodology was tainted and reflected the panel's manifest disregard of the law.

I do not agree. The panel's decision demonstrates that the panel culled the evidence, using what it found helpful and accurate and rejecting what it found questionable or inaccurate, when calculating its damages award. When the panel found some of the experts' assumptions to be questionable, the panel rejected those assumptions. The panel's discussion of its damages calculation refutes, in several ways, the argument that it manifestly disregarded the law.

First, the panel did not adopt Stephenson's analysis when arriving at a value for FSS. Because it found certain of Stephenson's assumptions to be questionable, and based on its evaluation of the evidence concerning FSS's business prospects, the panel found the analysis prepared by defendant's expert, Spadea, "more appropriate." Some of Spadea's conclusions were derivative of Stephenson's, that is, Spadea's analysis responded to Stephenson's, and thus implicitly used his assumptions. That fact does not taint the panel's analysis, however, because the panel then adjusted even Spadea's valuation based on other evidence in the record.

Second, when calculating damages, the panel considered a broad range of evidence, including evidence relevant to the application of the *Beverly Hills* factors. In *Beverly Hills,* it is not clear whether the trial court considered any evidence other than the expert's valuation.[FN3] In contrast, here, the panel both adjusted one of the expert valuations based on evidence concerning the difficulties FSS would need to overcome to earn profits, and also cited evidence supporting its finding that FSS would have earned profits.

FN3. It appears that the trial court in the *Beverly Hills* case accepted the expert's opinion without adjusting it based on the other evidence in the record, even though the assumptions on which the opinion was based were questionable. In addition, most of the other evidence in the record weighed against the imposition of lost profits damages. *See Beverly Hills,* 247 Conn. at 60-61.

Third, the *Beverly Hills* standard is whether there is "sufficiently accurate and complete evidence" from which the panel can estimate damages "with reasonable certainty." *Beverly Hills,* 247 Conn. at 70. That standard does not require the panel to disregard an expert's projection if there are aspects of the projection that the panel does not fully adopt. Here, no expert employed some of the assumptions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                  Page 7

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

the panel found appropriate, namely the panel's determination of the likely timing of product releases. Plaintiff's Exhibit D at 22.

*8 The *Beverly Hills* standard necessarily involves discretion, and depends, in large part, on the weight of the evidence. ICICI is arguing, in effect, that the panel did not understand the nuances of the governing law, or simply applied the law to the evidence incorrectly. Manifest disregard of law involves "more than a simple error in law or a failure by the arbitrators to understand or apply it; and, it is more than an erroneous interpretation of the law." *Duferco*, 333 F.3d at 389 (citing *Westerbeke*, 304 F.3d at 208); *see also Wallace*, 378 F.3d at 189. Here, there was more than enough evidence for the panel to reach a sufficiently accurate and complete estimate of FSS's value with reasonable certainty, and the panel did so. Accordingly, there is certainly a colorable justification for the panel's decision.[FN4]

> FN4. To the extent that ICICI suggests that the panel manifestly disregarded the law because it did not cite the *Beverly Hills* decision or use the buzz words "reasonable certainty" in its written decision, that suggestion has no merit. Arbitrators are not required to cite the reasons for their decisions, and a lack of an explanation does not mean that the arbitrator ignored the law. *Wallace*, 378 F.3d at 190. Here, the panel's explanation of its decision, even without citing *Beverly Hills*, is instructive, because it illustrates the panel's process of applying the *Beverly Hills* principle.

In addition, ICICI cites *Halligan*, 148 F.3d at 197, to support its argument that this case fits into the narrow set of circumstances in which the Second Circuit has determined that the manifest disregard of law doctrine applies. *Halligan* was one of the only cases since 1960 in which the Second Circuit reversed the District Court's confirmation of an arbitration award, and vacated the arbitration award based solely on the manifest disregard of law doctrine. In *Halligan*, an employee brought a claim under the Age Discrimination in Employment Act ("ADEA"), complaining that he had been terminated because of his age. The parties arbitrated the claim, and the arbitrator determined that there was no age discrimination. The arbitrator issued a written opinion, which did not explain the arbitrator's reasoning. The District Court confirmed the arbitrator's decision, because the record revealed conflicting evidence, the weighing of which seemed to depend on the arbitrator's credibility determinations.

The Second Circuit held that, in light of the overwhelming evidence of age discrimination, the arbitrator must have disregarded "the law or the evidence or both." *Halligan*, 148 F.3d at 204. The Court analyzed the evidence in great detail to conclude, in effect, that the only conclusion the arbitrator could have drawn based on the evidence was the employee had been terminated based on his age. ICICI analogizes that holding to this case, arguing that, in this case, the evidence was so overwhelming that the only conclusion the panel could have drawn was that FSS's profits could not be estimated with reasonable certainty.

*Halligan* was a unique case. The Court addressed two policy concerns in that decision. First, the Court expressed concern about whether an employee could effectively vindicate his federal statutory rights under the ADEA in the "arbitral forum." *Halligan*, 148 F.3d at 204. Second, the Court noted that the NASD had been criticized for the role it played in selecting arbitrators; thus, the Court seemed concerned about the impartiality of the arbitrators, particularly in the employment context where mandatory arbitration agreements were a source of controversy. *Id*.

*9 Subsequent Second Circuit decisions have cautioned the district courts not to rely too heavily on *Halligan*. *See, e.g., Wallace*, 378 F.3d at 192 (" Our later cases, however, have cautioned against an over-broad reading of *Halligan.*"); *GMS Group*, 326 F.3d at 78-79 (noting the unique policy concerns in employment discrimination claims). In fact, *Wallace* cited seven district court decisions issued after *Halligan* that explicitly relied on *Halligan* to vacate arbitration awards for manifest disregard of law. In response to those seven district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 8

Slip Copy, 2006 WL 3791386 (D.Conn.)
**(Cite as: Slip Copy)**

court decisions, the *Wallace* Court clarified that "[s]uch reliance is mistaken." *Wallace,* 378 F.3d at 192. In *GMS Group,* the Court explained that *Halligan* addressed "unique concerns at issue with employment discrimination claims." *GMS Group,* 326 F.3d at 79.

The policy concerns in *Halligan* are not present in this case, nor does this case involve interpretation of a federal statute. The unique analysis in *Halligan* does not apply to this case as ICICI argues, nor does *Halligan* broaden the scope of my review of the panel's decision. I must determine if there is a barely colorable justification for the panel's decision, not re-weigh the evidence. *See Wallace,* 378 F.3d at 193. As discussed above, I conclude that there is more than a barely colorable justification for the panel's decision, and thus, the panel did not manifestly disregard the law.

### III. Conclusion

FSS's motion to confirm **(doc. # 20)** is **GRANTED.** I confirm the panel's award to FSS in the full amount of $2,040,000, plus interest at the rate of 10% from August 13, 2006 "until the award is paid in full." *See* Plaintiff's Exhibit E at ¶ 2. ICICI's motion to vacate **(doc. # 24)** is **DENIED.** FSS's motions for judgment **(docs. # 15 and 19)** are **DENIED AS MOOT.** The clerk shall enter judgment and close this file.

It is so ordered.

D.Conn.,2006.
Four Seasons Software, LLC v. Icici Infotech, Inc.
Slip Copy, 2006 WL 3791386 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                   Page 1

Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

Stoddard v. Eastman Kodak Co.
W.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Marianne STODDARD, Plaintiff,
v.
EASTMAN KODAK COMPANY, Defendant.
No. 03-CV-6376T.

March 27, 2007.

Karen Sanders, Rochester, NY, for Plaintiff.
T. Andrew Brown, Brown & Hutchinson, Rochester, NY, for Defendant.

**DECISION and ORDER**
MICHAEL A. TELESCA, United States District Judge.

*INTRODUCTION*

*1 Plaintiff, Marianne Stoddard, ("Stoddard"), brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), (codified at 42 U.S.C. § 2000(e), et seq.); the Equal Pay Act of 1963.(codified at 29 U.S.C. § 206 et. seq.); New York State Human Rights Law, and New York State Labor Law against her former employer, Eastman Kodak Company ("Kodak" or "defendant") claiming that she was discriminated against on the basis of her gender, and retaliated against for complaining of discrimination. Defendant moves for summary judgment dismissing plaintiff's claims on grounds that plaintiff has failed to state a prima facie case of discrimination or retaliation, and that even if plaintiff has stated a prima facie case, she has failed to rebut the defendants' legitimate, non-discriminatory reason for terminating her employment. For the reasons set forth below, I grant defendant's motion for summary judgment.

*BACKGROUND*

Plaintiff Marianne Stoddard began working for defendant Eastman Kodak Company on March 21, 1981. Deposition Transcript of Marianne Stoddard (hereinafter referred to as "T.") at p. 37. Stoddard was hired as a "machine hand" and received compensation at a level 5 wage. (T. at 37). According to the plaintiff, shortly after being hired it was "common knowledge" that she was being "blacklisted" by a non-supervising manager. (T. at 38-39). Plaintiff, however, never complained of the alleged blacklisting. (T. at 39) [FN1]. Plaintiff undertook a sheet metal apprenticeship for approximately two years, but did not graduate from the program, allegedly because two-managers conspired to prevent her from graduating. (T. at 74-78). Thereafter, plaintiff worked for approximately nine months as an assembler. (T. at 80). In 1984, plaintiff became a writer in the Business Imaging Systems Department, where she worked until 1990. (T. 83-84). Although plaintiff admits that she was not aware of what salary allegedly similarly situated male employees received, nor what the educational or occupational histories of those male employees was, she contends that she was discriminated against during her entire tenure with the Business Imaging Systems Department because she was paid less than three male co-employees. (T. 85-90)

> FN1. Plaintiff contends that Kodak conducted two investigations of the alleged blacklisting, and that a human resources manager, Vernon Lott, made a verbal apology to her on behalf of Kodak for the blacklisting that allegedly occurred. (T. at 45-53) Although plaintiff alleges that a record of the investigation should be on file with Kodak, she has failed to submit any documentary evidence in support of her claim of the investigation, or that she received an apology on behalf of Kodak.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

Nor has plaintiff submitted any testimonial evidence from Vernon Lott with respect to the apology he allegedly offered to her.

In 1990, plaintiff began employment in the Customer Equipment Services Department as a Technical Writer. (T. 84-85, 94-95). According to the plaintiff there were approximately 120 writers in her department, and although she does not know how many of the writers were men or women, what the backgrounds of the writers were, or what salary they received, she contends that she was discriminated against on the basis of her gender with respect to her pay. (T. at 94-99). Plaintiff alleges that although she did not know the salary of her co-employees, her salary was less than that of her male co-employees, and that the discrepancy was unjustified because she was "the highest performer". (T. 97-100).

*2 In 1995, Stoddard received a Bachelor's degree in Computer Science from the Empire State College. (T. at 33-34). Plaintiff's school tuition was paid in full by Kodak. (T. at 34). That same year, as part of her Bachelor's degree program, plaintiff also received a certification in training design from Mager and Associates. (T. at 34-35).

From 1997 to 2000, Stoddard worked as a Quality Improvement Facilitator within Kodak. (T. at 114) She testified that although she did not know how many quality improvement facilitators worked at Kodak, or how many of those facilitators were men, or how much any other facilitator was paid, she was discriminated against by being paid less than male employees. (T. at 122-124).

In 2000, plaintiff assumed a new job at Kodak in the Corporate Quality department as a benchmarking coordinator. (T. at 125-126). Plaintiff claims that she was discriminated against in this position because the person who had previously held the position, a male, was given the title of a "director" rather than coordinator. According to Stoddard, the position of director had more "stature," because the person who had held the position before her (and who had held it for eight years) was invited on trips to which she was not invited, and reported directly to higher-level managers than she did. (T. at 126).

In January, 2001, plaintiff took what was to be her final job at Kodak, as a quality manager in the High Performance Imaging Systems Manufacturing department. (T. at 148). Although plaintiff had never worked as a manager before (T. at 161), she applied for the position at the urging of a Kodak manager named Willy Edmonds, ("Edmonds") whom the plaintiff described as her "mentor". (T. at 148). Although the application period for the position had already closed, Edmonds forwarded Stoddard's resume to Charlie Braun, ("Braun") the person to whom the quality manager would be reporting, and Braun thereafter contacted Stoddard to arrange an interview. (T. at 150-151)(May 12, 2006 Affidavit of Marrianne Stoddard at ¶ 11). Braun and several other managers interviewed Stoddard, and she received the highest evaluation score of all the applicants. She was offered the position, and began working in the position in January, 2001. (T. at 153-156).

As Quality Manager in the High Performance Imaging Systems Manufacturing department, Stoddard was responsible for implementing quality control standards that could be adopted throughout the department. (T. 157-58). Stoddard was also responsible, for the first time in her career, for managing a staff. (T. 166). After several months in the position, however, Braun became dissatisfied with Stoddard's performance, and noted this in a memo to plaintiff's personnel file on October 3, 2001. (T. at 170). Plaintiff contends that during her entire tenure as a Quality Manager, Braun and other white male managers impeded her ability to perform her job by not providing her with necessary resources, withholding information from her, failing to provide her with adequate staff, and not providing her with a budget. (T. at 173-176).

*3 Stoddard claims that any performance deficiencies were a result of discrimination against her in her position as a quality manager. She claims that she was not given adequate funding or resources to do her job. (T. at 173-174). She contends that she was excluded from information and educational opportunities. (T. at 174). Stoddard contends that another manager "was allowed to take

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 3

Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

highly skilled ... engineers that really belonged under [her] organization to be effective ..." and she was therefore deprived of "a major skill set." (T. at 175) Upon further examination, however, plaintiff admitted that the engineers she sought had reported to that manager prior to her arriving, and simply continued to report to that manager throughout her 11 month tenure as a quality manager. (T. at 176, 305).

Plaintiff alleges that she was not paid comparably to other men, but admitted that she was the only quality manager in her department, and that she was not aware of the salaries received by other male quality managers in other departments (T. at 223-224, 248, 252, 334-335) Indeed, Stoddard testified that she did not know whether or not she was paid more or less than other quality managers, male or female. (T. at 336).

Stoddard contends that she was impeded by the Human Resources department at Kodak, which made it very difficult to staff her department. (T. at 177). She alleges that she was singled out for disparaging treatment by her supervisor Charlie Braun. She claims that Braun yelled at her, belittled her ideas, yet approved of those same ideas if they came from "white male managers" (T. 177, 261-262). She claims that the other managers working in her department had offices with " mahogany doors," and that she was forced to work in a cubicle. (T. 178) She contends that she was not afforded the opportunity to hire interns. (T. 179).

Stoddard contends that she was subjected to more scrutiny than were male employees, and that her accomplishments were not recognized. (T. at 255, 256). According to the plaintiff, although nobody told her that she was subjected to more intense scrutiny, she could tell from the "demeanor" of her supervisors that she was being more harshly scrutinized than male employees. (T. at 257). Plaintiff also admitted that although she was not aware if other male employees were subject to scrutiny, she surmised that they were not because their performance was so poor. (T. at 257-258).

Plaintiff contends that she was not given a budget to work with, and that all male managers were given budgets. She concedes, however, that another female manager in her department was given a budget. (T. at 301).

In November, 2001, plaintiff was informed via a memo sent to all employees of an impending downsizing and restructuring of her department. (T. at 199-200). Plaintiff alleges that had Kodak been managed better, such downsizings would not have been required. (T. at 195). In December, 2001, plaintiff was notified that as part of the downsizing, her position was being eliminated. She was given an opportunity to take a different, full time permanent position in Kodak, still in a quality capacity, at the same wage, and with no diminution in benefits. (T. at 186, 201-202) Plaintiff also had the opportunity to seek any other position within Kodak over the next 60 days. (T. at 193). Plaintiff contends, however, that she was the only person downsized, that the position being offered to her was unattractive because it required her to report to a " peer" and that "the white males" in her department " were all taken care of" in that positions were created for them. (T. at 185, 186). Plaintiff admits, however, that she was unaware of the educational or occupational background of the person she considered to be her peer, but conceded that the " peer" had been a manger longer than she had, was more experienced, and had managed more people than she had. (T. at 187-189, 291-292). Plaintiff also admitted that she was unaware of the educational or occupational backgrounds of the persons that she complained were "taken care of" during the restructuring. (T. at 214-220). Plaintiff further admitted that she was aware that the downsizing plan was intended to reduce a department of 418 employees to 338 employees, and that several employees accepted voluntary separation. (T. at 194-196). According to the defendant, 21 employees accepted voluntary separation, 56 were either laid of or offered non-comparable jobs, and 10 employees, including the plaintiff, were offered comparable jobs. Defendant contends that of the ten people who were offered comparable jobs, only the plaintiff declined the offer.

*4 Plaintiff did not accept the position offered, and considered the new position "a demotion", that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 4
Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

would have "severely impacted her career" and "part of the game of keeping a woman down" (T. at 190, 191, 204). Instead, she "decided to constructively discharge myself because I was seeing a repeat performance of being sabotaged." (T. at 194). As a result, plaintiff resigned from Kodak on December 14, 2001 and accepted a position as a consultant with Bank of America. Although plaintiff continued on the Kodak payroll from December 14, 2001 through February 11, 2002, she began working for Bank of America effective January 1, 2002. (T. at 287, 292). As a consultant, plaintiff earned more money and greater benefits than she received in her final position at Kodak. (T. at 201, 287).

### DISCUSSION

#### I. Defendant's Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When considering whether a genuine issue of fact exists for purposes of a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2d Cir.1997). It is only if after considering the evidence in the light most favorable to the non-moving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *See Annis v. County of Westchester*, 136 F.3d 239 (2d Cir.1998).[FN2]

> FN2. In the instant case, rather than submitting evidence on behalf of the plaintiff to the court, plaintiff's counsel has expressly chosen to rely on the evidence submitted by the defendant, along with a single affidavit submitted by the plaintiff herself. *See* Affidavit of Attorney Karen Sanders in Opposition to Defendant's Motion for Summary Judgment at ¶ 3. Accordingly, while the court reviews the evidence submitted to the court in the light most favorable to the plaintiff, the court notes that the plaintiff has not submitted any evidence (other than the plaintiff's affidavit) in opposition to the defendant's motion.

#### II. *Plaintiff's Title VII Claims*

Plaintiff alleges in her Complaint that she was discriminated against on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, which prohibits an employer from "hir[ing] or ... discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000e-2.

Claims of employment discrimination are analyzed under the **well-recognized** burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Under the *McDonnell Douglas* test, the plaintiff bears the burden proving a *prima facie* case of discrimination. If the plaintiff succeeds in stating a *prima facie* case, the burden of production shifts to the defendant to state a legitimate, non-discriminatory reason for taking the employment action at issue. Should the employer meet that burden, the burden of production then shifts back to the plaintiff to show that the reasons proffered by the employer were not the true reasons for the adverse employment action, but instead were a pretext for discrimination, and that discrimination was the real reason. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502-06 (1993).

A. *Plaintiff has failed to state a prima facie case of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 5
Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

*gender discrimination under Title VII.*

1. *Constructive Discharge*

*5 To establish a prima facie case for unlawful termination resulting from gender discrimination under Title VII, a plaintiff must establish that she is a member of a protected class, was qualified for the position she held, was discharged, and that the discharge occurred under circumstances giving rise to an inference of discrimination. *See* **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973). Although the Second Circuit Court of Appeals has stated that "the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimis*," *Tomka v. Seiler Corp.*, 66 F.3d at 1308 (internal citations omitted), it has also noted that "[a] jury cannot infer discrimination from thin air." *Norton v. Sams Club*, 145 F.3d 114 (2nd Cir.), *cert. denied* 119 S.Ct. 511 (1998).

In the instant case, plaintiff has failed to establish that she was discharged, and further has failed to establish that she was discharged under circumstances giving rise to an inference of discrimination.

While plaintiff alleges that she "constructively discharged herself," plaintiff has failed to allege the essential elements of such a claim, and further has failed to submit any evidence upon which a trier of fact could find that a constructive discharge had taken place. To establish a cause of action for constructive discharge in a Title VII action, the plaintiff must demonstrate that his or her employer made working conditions so intolerable that the employee was forced to resign. *Stetson v. NYNEX Service Co.*, 995 F.2d 355 (2d. Cir.1993). However, mere dissatisfaction with the nature of one's working conditions does not state a claim for constructive discharge. *See Martin v. Citibank, N.A.*, 762 F.2d 212 (2d Cir.1985) (difficult or unpleasant working conditions do not constitute intolerable conditions for purposes of constructive discharge); *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983) (dissatisfaction with working conditions does not state claim for constructive discharge).

In the instant case, plaintiff has provided no evidence upon which a trier of fact could determine that the conditions of her employment were so intolerable that she was forced to resign. Rather, the uncontroverted facts reveal that plaintiff, in the midst of a department-wide downsizing and reorganization, was offered a comparable position with no diminution of pay or benefits; that plaintiff refused the offer; and that the plaintiff instead took a higher-paying job with another company. It is well settled that where a job action results in no diminution of pay or benefits or a demotion, that action cannot, as a matter of law, be considered an adverse employment action. *Shabat v. Blue Cross Blue Shield of the Rochester Area*, 925 F.Supp. 977, 989 (W.D.N.Y.1996)(Larimer, C .J.) The fact that plaintiff subjectively considered the transfer she was offered to be a demotion, in light of the fact that plaintiff would not have been subjected to any diminution in pay or benefits, and in light of the fact that she has failed to establish any evidence that anyone other than herself perceived the transfer to be a demotion, fails to demonstrate that she was subjected to an adverse employment action or discharge. *See e.g. Blessing v. J.P. Morgan Chase and Co.*, 394 F.Supp.2d 569, 577 (S.D.N.Y., 2005) (employee's subjective dissatisfaction with employment action does not constitute evidence of adverse employment action); *Wright v. Milton Paper Co.*, 2002 WL 482536, *8 (E.D.N.Y. March 26, 2002) (Speculative and conclusory allegations of discrimination insufficient to make out a prima facie case of discrimination) *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.")(citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)).

*6 Accordingly, for the reasons set forth above, I find that plaintiff has failed to state a prima facie case of unlawful termination of her employment.

2. *Disparate Pay*

Plaintiff alleges that she did not receive compensation equivalent to compensation received by male employees. "To establish a prima facie case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy   Page 6

Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

of disparate pay under Title VII, a plaintiff must show: '(1) that [s]he was a member of a protected class; (2) that [s]he was paid less than similarly situated non-members of [her] protected class; and (3) evidence of discriminatory animus.' " *Thomas v. iStar Financial, Inc.,* 438 F.Supp.2d 348, 367 (S.D.N.Y.,2006) (quoting *Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377, 383 (S.D.N.Y.2002).

In the instant case, plaintiff has failed to introduce any evidence with respect to the compensation of any male employees, whether similarly situated to her or not. Instead, plaintiff, throughout the course of her 489 page deposition, merely stated repeatedly that male employees were paid more than female employees. However, when asked whether or not she knew how much any male employees were paid, she admitted that she did not know, and could only guess that she was paid less than male employees. Indeed, plaintiff admitted that she could have been paid *more* than similarly situated male employees. Nor has plaintiff submitted any documentary evidence that would support a claim for unequal pay. Accordingly, because plaintiff has produced no evidence with respect to her claim that she was paid less than comparable male employees at Kodak, I find that she has failed to state a claim for disparate pay.

### 3. *Disparate Treatment*

Plaintiff alleges that she was treated differently than male employees in that she received less support from co-employees, was subjected to poorer office space than male employees, and was forced to use sub-standard computer equipment. To state a claim for disparate treatment based on gender under Title VII, a plaintiff must establish that she is a member of a protected class, was qualified for the position she held, was subjected to an adverse employment action, and that the adverse employment action or actions occurred under circumstances giving rise to an inference of discrimination. *Feingold v. New York,* 366 F.3d 138, 152 (2nd Cir.2004).

In the instant case, plaintiff alleges that she was discriminated against during all but 9 months of her entire 20 year career at Kodak. (See T. at 80) (describing 9 month time period during the 1980's when she worked as an assembler as a time that she was "fairly treated"). With respect to the specific claims at issue in this case however, she claims that she was not provided with adequate resources to do her job, was singled out for criticism by her supervisor, was given less desirable workspace than her male counterparts, was given a non-functioning computer, did not have a phone, and was not allowed to hire people she needed to staff her department.

*7 Initially, I note that plaintiff's claim that she was not provided with a functioning computer or phone is found only in her May 12, 2006 Affidavit in Opposition to Defendant's Motion for Summary Judgment, and is not corroborated by any other evidence. *See* May 12, 2006 Affidavit at ¶¶ 22, 23. Plaintiff made no such allegation of a non-functioning computer, or lack of a phone during two days of deposition testimony, during which proceedings she was asked repeatedly to describe all of the ways in which she was discriminated against. Nor is any such allegation set forth in the Complaint.

It is well settled that a plaintiff "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Department of Corrections,* 85 F.3d 614, 619 (2nd Cir.1996) (citations omitted). As stated by the court in *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Thus, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes,* 85 F.3d at 619.

In this case, plaintiff's complaints regarding her phone and computer contradict her deposition testimony. Accordingly, I find that neither of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 7
Slip Copy, 2007 WL 952020 (W.D.N.Y.)
(Cite as: Slip Copy)

alleged issues raises a genuine issue of material fact.

With respect to plaintiff's claim that she was forced to work in a cubicle while other managers worked in offices with "mahogany doors", she has failed to submit any evidence in support of this claim. Indeed, her testimony was contradicted by Willie Edmonds, (whom the plaintiff described on three occasions during her testimony as her "mentor") who testified that all of the managers in the department had cubicles, and that in fact, Edmonds cubicle was adjacent to Stoddard's. (Deposition testimony of Willie Edmonds at p. 35-36).

With respect to plaintiff's claim that she was not allowed to hire employees to staff her department, I find that this claim fails to establish a prima facie case of discrimination. Although plaintiff alleges that she was not allowed to hire people, or was impeded in her efforts, her testimony indicates that she had indeed hired 26 people into her department. (T. at 160). While the plaintiff alleged that she was not able to hire the most qualified people, and that other managers were, she admitted that the personnel she sought were employees who had already been reporting to another manager prior to her arrival in the department, and who simply continued to report to that manager. (T. at 175-76). Nor is there *any* evidence that she was prevented from hiring people because she was a woman. Similarly, plaintiff has failed to provide any evidence in support of her conclusory allegations that she was not given a budget to work with, and that all male managers were given a budget.

*8 For the reasons set forth above, I find that plaintiff has failed to state a claim of discrimination based on alleged disparate treatment.

*B. Defendant has set forth a legitimate non-discriminatory reason for terminating plaintiff's employment.*

Even if the plaintiff were able to state a prima facie case for employment discrimination as a result of her being required to transfer to another position within Kodak, the defendant has stated a legitimate, non-discriminatory reason for requesting that the plaintiff transfer to another position within Kodak. The defendant has submitted evidence, that has not been controverted, that the department within which plaintiff worked was undergoing a reorganization and downsizing, and that approximately 80 out of 420 positions were being eliminated. Accordingly, defendant's rationale for eliminating plaintiff's position (a reorganization and downsizing) states a legitimate, non-discriminatory reason for terminating plaintiff's employment. *See Bartz v. Agway, Inc.*, 844 F.Supp. 106, 112 (N.D.N.Y.1994) (reduction in force as part of reorganization states a legitimate, non-discriminatory reason for discharging plaintiff).

*C. Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reason for terminating the plaintiff's position.*

Once the defendant has stated a legitimate, non-discriminatory reason for taking an adverse action against an employee, the plaintiff bears the burden of demonstrating that the defendant's stated reason for taking the action is pretextual, and that discrimination is the real reason for the adverse action. In the instant case, although plaintiff has failed to establish that she was discharged, either constructively or otherwise (even assuming she could demonstrate that such action was taken) she has failed to rebut the legitimate, non-discriminatory reason set forth by the defendant for the action.

While plaintiff alleges in conclusory fashion that the white male managers in her department were preferentially "taken care of" during the reorganization, and that by being offered a transfer to a similar position with no diminution of pay or benefits she was discriminated against, plaintiff has offered no evidence in support of her contention that white male managers received more favorable treatment in connection with the reorganization. Plaintiff's conclusory allegations are insufficient to rebut defendant's proffered reason for eliminating plaintiff's position. *See Wright*, 2002 WL 482536, at *8 (Speculative and conclusory allegations of discrimination insufficient to make out a prima facie case of discrimination) *Schwapp*, 118 F.3d at 110("

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 8

Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.") (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). On a motion for summary judgment, a plaintiff rebutting the defendant's position may not simply rely on "some" evidence of pretext, but instead must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2nd Cir.1994). Plaintiff has submitted no evidence that the reorganization and downsizing was a pretext for discrimination, or that white male managers were treated more favorably than she was. Accordingly, she has failed to submit evidence upon which a reasonable finder of fact could determine that discrimination "was more likely than not ... the real reason" for plaintiff's discharge. *Woroski,* 31 F.3d at 110. Accordingly, I find that plaintiff has failed to rebut the legitimate, non-discriminatory reason proffered by defendant as the reason for plaintiff's reassignment.

### III. *Equal Pay Act Claims*

*9 Plaintiff alleges that throughout her career at Kodak, she received less compensation than similarly situated male employees. To establish a prima facie case under the Equal Pay Act, "a plaintiff must demonstrate that 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Ryduchowski v. Port Authority of New York and New Jersey,* 203 F.3d 135, 142 (2nd Cir., 2000)(quoting *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

Plaintiff has provided no evidence that any similarly situated male employee was paid more than she was during her tenure at Kodak. Although plaintiff contends that she was paid less than male employees, she admitted that she did not know how much any of the complained-of male employees were paid, and she has not provided any documentary or testimonial evidence upon which a trier of fact could find that she was paid less than comparable male employees. Simply stated, there is no evidence in the record identifying which male employees were allegedly comparable to the plaintiff, or more importantly, what the compensation of those employees was. Accordingly, there is no evidence upon which a finding could be made that plaintiff was paid less than similarly-employed male employees. I therefore grant defendant's motion for summary judgment with respect to plaintiff's Equal Pay Act claims.

### III. *Retaliation Claim*

A prima facie case of retaliation requires the plaintiff to prove: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse action. *Holt v. KMI-Continental,* 95 F.3d 123, 130 (2d Cir.1996), *cert. denied,* 1997 WL 71191 (May 19, 1997). The defendant then has the opportunity to articulate a non-discriminatory legitimate reason for the employment action and then the burden shifts to the plaintiff to show that the employer's articulated reason is both untrue and a pretext for the true discriminatory motive. *Id.*

Therefore, for the reasons stated in this decision, I find that plaintiff has failed to demonstrate that she was subjected to any adverse employment action at Kodak. Accordingly, I find that plaintiff has failed to state a cause of action for retaliation.

### IV. *State Law Claims*

Plaintiff alleges that he was discriminated against on the basis of her gender in violation of the New York Human Rights Law and New York Labor Law. Claims brought under the New York Human Rights Law, are analytically identical to claims brought under Title VII. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708 (2nd Cir.1996). *See Haywood v. Heritage Christian Home, Inc.,* 977

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 9

Slip Copy, 2007 WL 952020 (W.D.N.Y.)
**(Cite as: Slip Copy)**

F.Supp. 611, 613 (W.D.N.Y.1997)(Larimer, C.J.)(Noting that both claims are governed by *McDonnell Do uglas* standard.] ). Accordingly, for the reasons stated above, plaintiff's state law claims under the Human Rights Law are dismissed. Because plaintiff has failed to submit any evidence that she was subjected to unequal pay in violation of New York State Labor Law, I grant defendant's motion for summary judgment with respect to that claim as well.

*CONCLUSION*

*10 For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2007.
Stoddard v. Eastman Kodak Co.
Slip Copy, 2007 WL 952020 (W.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.