AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT DISPUTES TRIBUNAL
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CAP GEMINI ERNST & YOUNG U.S., LLC,  :
         Claimant,  :
                                                Case No. 13 160 00151 04
    v.  :

CHARLES ARENTOWICZ,  :
         Respondent.
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## FINAL AWARD

      This matter comes before this Panel by means of a demand for arbitration (the "Demand") filed by Claimant Cap Gemini Ernst & Young U.S. LLC ("Claimant" or "CG") against Respondent Charles Arentowicz ("Respondent" or "Arentowicz") dated January 14, 2004. In its Demand, Claimant alleges that Arentowicz breached his employment agreement dated April 22, 2000 (the "Agreement") by pursuing his age discrimination and related claims in court rather than in arbitration as required by the Agreement's arbitration provision. Arentowicz, in turn, asserts counterclaims for age discrimination under New Jersey's Law Against Discrimination and for a declaratory judgment seeking to reject the arbitration clause in the Agreement as unconscionable. The full Panel rules that New Jersey law applies to the parties' claims here.

      The hearing in this matter was held on December 4, 5, and 6, 2006. The parties have requested a reasoned award from the Panel under Rule 34(c) of the AAA's National Rules for the Resolution of Employment Disputes. Based on the testimony and documentary evidence presented to the Panel at the hearing, the pre-hearing and post-hearing briefs, a full review of the record in this case submitted to the Panel, and applicable case law, we make the following findings and rulings.

### Cap Gemini Claims

      Claimant Cap Gemini's breach of contract and declaratory judgment claims are denied. The Agreement does not clearly and unmistakenly require

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant

V.

CHARLES ARENTOWICZ, Respondent

Case No. 13 160 00151 04

that any challenge to arbitrability be submitted to the arbitrators rather than to a court. In any event, the sole relief sought by Cap Gemini is payment of its attorneys' fees on its motion to compel. Under the American Rule, each party is required to bear its own legal costs in the absence of a statutory or contractual basis for the recovery of fees, neither of which is present here.

### Arentowicz's Age Discrimination Claim

Respondent alleges that he was selected for layoff because of his age, 54. Arentowicz bears the burden of demonstrating that age actually played a *determinative* role in the decision to terminate his employment. As recently stated by the Third Circuit in *Marione v. Metropolitan Life Insurance Co.*, 188 Fed. Appx. 141, 145 (3d Cir. 2006), a party asserting a claim of age discrimination in a reduction-in-force ("RIF") setting must offer sufficient probative evidence to allow a fact-finder to reasonably infer that the employer's stated reasons are not worthy of belief and are a "*post hoc* fabrication" or otherwise did not actually motivate the challenged decision. If the Panel were to reject or disbelieve Cap Gemini's stated reasons, it may (but is not required to) infer intentional discrimination. Proof that the decision to select Arentowicz for layoff was not "wise, shrewd, prudent or competent", in the absence of a showing of unlawful animus, is not enough for Arentowicz to sustain his claim. Id.

We find that Respondent did not bear his burden of demonstrating that age was a determinative factor in the decision made by David Wilson, who was 58 years old in December 2002, to include Arentowicz in the RIF. In reaching this conclusion, we find significant that the age of the other three vice presidents released in the Life Sciences Department were 57, 49, and 39 and evidence no pattern of age animus. See *Marione*, 188 Fed. Appx. at 145 (age claim in RIF setting dismissed where employees "of all ages were terminated in the RIF, and employees of all ages were retained."); *Spencer v. Hudson Trader Inv. Services*, 2006 WL 1644859 *5 (D. N.J.)(age claim undercut by termination of younger employee).

The parties do not dispute that: Cap Gemini's financial crisis was real; the RIF was business related; the company was entitled to set the ground rules for the RIF, and; elimination of four vice president positions in the Life Sciences Department was warranted. The RIF decisions were based on management's assessments of which vice presidents would raise substantial revenue over a

2

short time frame, i.e., the impending three to four months. Wilson explained that Cap Gemini was in "survival mode" and retained vice presidents who could deliver "revenue now" or "who were in the position to sell revenue and deliver it immediately, now." Wilson tentatively selected the four vice presidents to be laid off. Upper management and Wilson's management's team voiced no objections to the inclusion of Arentowicz in this group.

Arentowicz challenges the merits and veracity of Cap Gemini's business decision. Admittedly, Cap Gemini's failure to timely produce documentation related to the forecasted business production of the individual vice presidents in Life Sciences and Wilson's at times inconsistent testimony on certain points were troubling and weigh in favor of Arentowicz's claim. Those inconsistencies, however, have been greatly exaggerated by Respondent. Overall, we found Wilson's testimony to be credible and not evidence of pretext. Wilson's failings, if any, were the product of a faded memory of a former executive recollecting events over three years after the fact, the absence of key documentation that could have refreshed that recollection, and the chaotic setting in which these difficult decisions were made by Cap Gemini management in the latter part of 2002.

In contrast, we found Arentowicz's testimony to be less than forthright at times. For example, his repeated representation that he did not know of other RIFs in the 2001-02 time period is contradicted by his own contemporaneous statement in his 2001 performance review. (See CG Exh. 2, p. 0677) In any event, that testimony is simply not credible in the face of the overwhelming evidence to the contrary. The same holds true for Respondent's testimony as to whether Merck was ever a GSU account, which was contradicted by documents and his deposition testimony. (See e.g. CG Exh. 5, p. 0065; CG Exh. 43, pp. 146-47, 156-57) Arentowicz similarly contradicted his own deposition testimony at the hearing. (See e.g. Hearing Tr. 281-82)

Perhaps most significantly, Arentowicz failed to provide specific and convincing evidence on the key question at hand, the likelihood that he personally would produce or sell immediate revenue in the months following the RIF, which severely undercut his case. (See e.g. CG Exh. 43, pp. 180-84) For example, he testified in his deposition with respect to a possible upgrade of Merck's sales and marketing system that "there was always a possibility, but we were not sure they were going to do that." (CG Exh. 43, p. 180) His testimony

3

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant

v.

CHARLES ARENTOWICZ, Respondent

Case No. 13 160 00151 04

about immediate revenue generation focused mostly on projects for Merck from 2002 that were expected to continue into 2003 for which his continued presence did not appear to be required. Beyond that, he indicated that he "would have to look at some of the documents" because he "can't remember – all the three – three years ago" in order to recall other projects that might generate revenue in 2003. (CG Exh. 43, p. 184)

In reaching our determination, we rely on Arentowicz's own testimony and contemporaneous writings supporting the view that not all was well with the Merck account in late 2002. For example, Respondent testified: (i) that he specifically approached Wilson in the Fall of 2002 to seek special pricing on a piece of Merck business which "wasn't at the level of profitability that we had in the past at Merck. So I needed his approval for those rates, and we did get that from him" (CG Exh. 44, p. 165); (ii) he was having trouble leveraging the financial operations project into additional work because it was "a major cultural change [for Merck], and they couldn't deal with it. They were going slow . . . ." (CG Exh. 44, p. 173), and; (iii) profits levels were down 2001 to 2002 from 24% to 2.4% on business for which Respondent was engaged as engagement director and from 17% to 9% on accounts in which he was account director. (Cf. Respondent's self-assessments in CG Exh. 2, p. 0683 with CG Exh. 5, p. 0067).

Arentowicz also heavily relied on the annual projections prepared as part of management's failed effort to make Merck, Arentowicz's most important client, a global, or GSU, client. These projections generated by Arentowicz and Bob Gray, the vice president selected to run the Merck account in the event it became a GSU account and who had not previously worked on that account, ambitiously predicted revenue growth of 4 to 5 times the revenue for 2002 in the U.S. (from $1.3 million to $5.7 million) in a one year period. Significantly, Merck was withdrawn as a global account after the GSU leader reviewed these projections. We also note that the projections relied upon by Arentowicz covered the entire year of 2003, not the first few months of the year, which was the focus of management in making its layoff decision. In sum, Arentowicz cannot credibly buttress his age claim by invoking unsubstantiated projections, which he himself helped prepare and which were never adopted by Cap Gemini, as probative evidence of immediate revenue that he would have generated.

Arentowicz also relied heavily on favorable historical performance data on his accounts, for example, that the Merck account produced $5.2 million in

4

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant                    Case No. 13 160 00151 04

v.

CHARLES ARENTOWICZ, Respondent

sales through September 2002. Arentowicz, however, never credibly rebutted Wilson's claim that the Merck account was not producing revenue as expected and that the revenues that were coming in were generated by others working on the account. Similarly, Wilson's claim that Respondent's second key account, J. D. Edwards, was "small potatoes" is confirmed by Arentowicz's own deposition testimony in which he testified about "some small work" that was being performed for that client and lost bids for new work. (See CA Exh. 43, pp. 113-17) Arentowicz's low utilization rate further supports the view that he was not likely to generate immediate revenue as required by Cap Gemini in survival mode.

Arentowicz further cites in support of his claim the absence of written criteria for the RIF and the written "business case" prepared by Human Resources personnel which was inconsistent with the reason offered by Wilson for the selection of Respondent. Neither supports a claim of age discrimination. As pointed out by Cap Gemini, there is no requirement that the criteria for a RIF, particularly under the desperate circumstances that Cap Gemini found itself at the time, be in writing. Further, we find no significance to the verbiage in the business case which was prepared in September or October 2002 by Human Resources, not Wilson, based on information available to it at the time that was basically accurate. More importantly, the record supports the view that the "business case" played no role in the decision to lay off Arentowicz.

Arentowicz offers in support of his age claim the fact that Cap Gemini hired two vice presidents in 2002, Joseph Coppola and Douglas Helmink, to fill specific roles to which Arentowicz was not suited. Coppola was hired in May 2002. Helmink was interviewed in the Spring of 2002. An offer was made to Helmink in August and he began with Cap Gemini in November. Helmink was hired not to replace Arentowicz but as a possible replacement for Wilson. Helmink himself was laid off in 2003. Further, the evidence was unrebutted that Coppola was hired to expand Cap Gemini's client relations management business, an area in which Arentowicz had no particular expertise. We find significant that Coppola was laid off almost immediately after Arentowicz and was rehired when it was demonstrated that he was necessary to bring in an additional piece of business, supporting the view that management's decisions at the time were based solely on immediate revenue production. The recruitment of two vice presidents in 2002 to fill specific needs, prior to the direction to reduce Life Sciences by four vice presidents, does not support a finding of age animus on the part of Cap Gemini.

5

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant                    Case No. 13 160 00151 04

V.

CHARLES ARENTOWICZ, Respondent

    We also reject as probative of age discrimination the excerpted comments made by Cap Gemini's worldwide head, Paul Hemerlin, as reported in the *Wall Street Journal* and statistics for its annual report setting forth the demographics of its workforce. In addition to being rank hearsay, these comments and statistics are ambiguous at best and of no probative value in this case. This is especially so since the testimony is unrebutted that Hemerlin played no role in Wilson's decision-making process. (Tr. 293, 463)

    Finally, we find Arentowicz's use of company-wide statistics misplaced. Respondent did not assert a pattern and practice case nor a viable disparate impact case. His claim focused on a single decision made by Wilson, the decision to select him to be the fourth vice president to be laid off in December 2002. Company-wide statistics relating to over 500 vice presidents performing vastly different functions (rather than merely of the Life Services Department headed by Wilson) that purport to show a pervasive pattern of age discrimination company-wide are, in these circumstances, of little or no probative value. We also have no evidence in the record of the criteria applied (i.e. whether the same standard of current revenue generation was applied) in these far-flung departments and offices in determining which vice presidents were to be laid off. As the Supreme Courts warned in *Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620 (1974), "simplistic percentage comparisons" lack meaning in a situation in which the members of the relevant class are not "fungible" which certainly is the case at the vice president level.

    Moreover, careful review of the ages of the vice presidents in Life Services (see CA Exhs. 16, 20) and the termination decisions made by Cap Gemini with respect to these vice presidents demonstrate no discernable pattern of age animus. See e.g. *Marione*, supra, 188 Fed. Appx. at 145 (employee's statistics rejected, in an age discrimination case in a RIF setting, where a majority of those retained were in the protected class, i.e., were over 40 years of age, as is the case here.)

    We note our colleague's dissent. So as not add any additional expense to the parties, Arbitrators Townley and Feliu have chosen not to respond except to note that we disagree with our dissenting colleague's characterizations of our positions and rationale.

6

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant     Case No. 13 160 00151 04

v.

CHARLES ARENTOWICZ, Respondent

    In sum, Arentowicz's evidence, built on supposition, hearsay, and evidence of limited or no probative value, fails to permit a reasonable inference that age played a determinative factor in Cap Gemini's decision to terminate his employment as part of its December 2002 RIF.

INTENTIONALLY BLANK

American Arbitration Association
Employment Arbitration Tribunal

---

In the Matter of the Arbitration between

Re:   13 160 00151 04

   Cap Gemini Ernst & Young U.S., LLC, Claimant

   -against-

   Charles Arentowicz, Respondent

---

# FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been duly designated in the employment agreement dated April 22, 2000 (the "Agreement"), and having been duly sworn, and having duly heard the proofs and allegations of the parties, hereby AWARD as follows:

1) Respondent, Charles Arentowicz, did not breach the terms of the Agreement by filing a court action in New Jersey State court and, therefore, Claimant's breach of contract and declaratory action claims are dismissed.

2) Respondent, Charles Arentowicz, did not carry his burden of demonstrating age discrimination under New Jersey's Law Against Discrimination.

3) The administrative filing and hearing fees of the American Arbitration Association, totaling $3,000.00, and the fees and expenses of the Arbitrators, totaling $93,642.25, shall be borne as incurred.

4) This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted are hereby denied. This Award may be executed in any number of counterparts, each of which shall be deemed as an original,

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant

v.

CHARLES ARENTOWICZ, Respondent

Case No. 13 160 00151 04

and all of which shall constitute together one and the same instrument.

_____     _____
Date                                                    ROSEMARY TOWNLEY


_____     _____
Date                                                    ALFRED G. FELIU


_____     _____
Date                                                    LEWIS T. MALTBY



State of New York    )
                     ) ss.:
County of Westchester)


_____     _____
Date                                                    Rosemary Townley


On this day, the above arbitrator came and appeared before me and confirmed to me that he is the individual described herein and acknowledged to me that he is the individual who executed the foregoing instrument.


_____     _____
Notary Public                                    Date

9

CAP GEMINI ERNST & YOUNG U.S., LLC, Claimant

    v.

CHARLES ARENTOWICZ, Respondent

Case No. 13 160 00151 04

State of New York    )
                            )ss.:
County of Westchester  )

_____                            _____
      Date                                                          Alfred G. Feliu

    On this day, the above arbitrator came and appeared before me and confirmed to me that he is the individual described herein and acknowledged to me that he is the individual who executed the foregoing instrument.

_____                              _____
  Notary Public                                                      Date

State of New Jersey )
                           )    ss.:
County of          )

_____                              _____
      Date                                                          Lewis T. Maltby

    On this day, the above arbitrator came and appeared before me and confirmed to me that he is the individual described herein and acknowledged to me that he is the individual who executed the foregoing instrument.

_____                              _____
  Notary Public                                                      Date

13 160 00151 04
CAP GEMINI ERNST & YOUNG U.S., LLC
    Claimant

and

CHARLES ARENTOWICZ
    Respondent

Dissenting Opinion

With all due respect to my colleagues, I would decide this case differently.

The critical issue, on which the outcome of this case depends, is whether Arentowicz has sustained his burden of proof that he was discriminated against because of his age. (Both parties have met their burden of production.)

The parties agree that the reduction in force was not a pretext for discrimination, but was brought about by adverse business conditions. Nor is it disputed that Cap Gemini was extremely concerned with short-term revenue, and that this criteria played a significant role in to determining which employees to terminate. The issue is whether age played an impermissible part in this process.

Arentowicz's case consists of three elements:

General Indicia of Discriminatory Attitudes

Arentowicz points to the fact that Cap Gemini compiled data on the age distribution of its executives and published them in its annual report. We have no direct evidence of its purpose for doing so. The most plausible interpretation is that Cap Gemini was trying to project an image of youth and dynamism to investors. There may be other interpretations, but Cap Gemini has not proposed any. While the precise purpose is not entirely clear, it is difficult to conclude that Cap Gemini was completely indifferent to age.

Arentowicz also points to remarks allegedly made by Cap Gemini's CEO, Paul Hermelin. Standing alone, these comments mean little. While they could be read in the manner Arentowicz suggests, they could also be read in a manner that does not indicate bias. The fact that Cap Gemini collected and published data on executive age suggests that the discriminatory interpretation is correct, but this is far from certain.

In total, this evidence suggests that age may be involved in Cap Gemini's decision making. This is probative, but is entitled to very little weight.

Revenue Projections

Arentowicz does not dispute Cap Gemini's claim that short-term revenue projection played a major role in choosing which Vice Presidents would be terminated.

Arentowicz argues, however, that his revenue projection met the criteria for retention. In the fall of 2002, Arentowicz and his colleague Bob Gray projected sales of $15 million and revenue of $9 million for Merck in 2003 (which was Arentowicz's largest account). This projection was made in the course of consideration of making Merck a global account (GSU). To become a GSU, an account had to have projected sales of $15 to $20 million. Ultimately, Cap Gemini decided that the projected revenue from Merck was not high enough to make it a GSU.

While not enough for GSU status, the Arentowicz/Gray projection for Merck was more than enough to meet the requirement for retention during the RIF. David Wilson, the former executive at Cap Gemini that decided who to terminate Arentowicz, testified that a vice president needed to have projected business (he was not clear whether this meant sales or revenue) of $3 to $5 million to retain his or her job. (R9, page 106) Claimant's projection was twice that amount.

This evidence is entitled to more weight. The Arentowicz/Gray projection is not the official projection that was used to make termination decisions. Moreover, Arentowicz and Gray are hardly disinterested parties. Nevertheless, it bears directly on the issue of whether Arentowicz was really terminated because of poor revenue projections. It would be entitled to little weight if Cap Gemini had produced the official projections in use at the time the termination decisions were made. Cap Gemini, however, did not produce revenue projections for Arentowicz or any of the other vice president. As the only projection on the record, the Arentowicz/Gray projection has some probative value.

Statistical Evidence

Arentowicz presented the testimony and report of Donald Welsch, which contained a statistical analysis of the relationship between age and termination at Cap Gemini. Welsch found that the termination rate of Cap Gemini vice presidents under 40 years old was 5.36%. The termination in Arentowicz's age group (50-54) was 19.4%, more than three times higher. Welsch testified that "with a reasonable degree of professional certainty" age was likely to be been a determining factor in Arentowicz's termination.

Like my colleagues, I have problems with this report. Welsch compared the termination rates of employees under 40 with the two groups of employees between 50 and 59. He does not include, however, the termination rate of employees 60 or older. There is no reason to exclude these employees from the analysis. If Cap Gemini were terminating vice presidents over 50 because of their age, they would also discriminate against employees over 60. Because of this, I cannot accept the report at face value.

However, when one analyzes the data in Welsch's report in the appropriate manner, there is still evidence of age discrimination. Vice presidents under 40 were terminated at a rate

2

of 5.35%. Vice presidents over 40 were three times as likely to be terminated, with a rate of 16%.

The admissibility and probative value of this evidence is one of the two major issues on which I part with my colleagues.

My colleagues believe that we are barred from considering the argument of a company wide practice of discrimination because Arentowicz did not present his case in this manner.

It is true that Arentowicz focused most of his attention during discovery and the hearing on Wilson. However, he did not claim that Wilson had a personal animus against older employees. To the extent that Arentowicz articulated a rationale for the alleged discrimination, it was that there was a company wide practice of favoring younger employees that improperly influenced Wilson's decision and led him to terminate Arentowicz instead of a younger vice president. The sole thrust purpose of Arentowicz's evidence of Cap Gemini's presentation of age data in its annual report and the allegedly discriminatory remarks of CEO Paul Hermelin was to show company wide bias against older employees. Arentowicz' statistical analysis was also company wide. Under these circumstances, it is clear that Cap Gemini has not blindsided by this claim. Nor did Cap Gemini object to the use of company wide statistics on the ground that they had been defending a claim based on Wilson.

My colleagues believe that, even if we consider this arugment, that the statistical analysis has no probative value because the employees in the analysis are not comparable.

It is true, of course, that employees must be comparable for the analysis to be meaningful. Otherwise, the data could be skewed by a variable other than age. In the present case, for example, there might easily be a relationship between age and compensation. Cap Gemini, because it's goal was to cut costs, might be more likely to terminate higher paid employees, because this would save more money. This could lead to more older employees being fired, even though age was not considered in termination decisions. Welsch's report, however, eliminated any potential skewing of the data from this factor by limiting his analysis to vice presidents.

My colleagues believe that Welsch's analysis is meaningless because it fails to neutralize the potentially skewing effects of other confounding variables, specifically division and job function. They believe that the analysis should be limited to vice presidents within the Life Sciences division. I disagree. As indicated above, if there was a bias against older employees at Cap Gemini, it was not confined to the Life Sciences division, but was company wide. Thus, the proper scope of analysis was all Cap Gemini vice presidents, exactly the group that Welsch examined.

My colleagues also believe that Welsch should have considered only vice presidents with the same job function as Claimant. They have provided no reason to suspect, however, that there is any connection between job function and age that could skew the analysis.

3

Unlike level of responsibility in the company, which could well increase with age, there is no reason to think that vice presidents involved in sales are any older or younger than vice presidents involved in administration or other disciplines.

A confounding variable, by definition, is a variable that may skew the data by being correlated with the variable being measured. There is no single set of variables that must be considered in every statistical analysis. Rather, one must examine all the variables and neutralize the affect of any variable that might reasonably be expected to skew the analysis. But one need not neutralize the effect of variables in the absence of any reason to believe have any impact on the analysis.

My colleagues take the position that, even if not required by the rules of statistics, these variables must always be considered as a matter of law, even if they were not part of the employer's decision-making process and could not have skewed the data. I believe they are in error.

In the cases we read that required analyses to eliminate possible effects of additional variables, there was reason to believe that failure to do so could create a spurious indication of age discrimination. For example, in Hemsworth v. Quotesmith.Com (476 F.3d 487), the seventh circuit found no probative value in a statistical analysis that did not compare employees with equal qualifications. In Balderston v. Fairbanks Morse Engine (328 F.3d 309), the same circuit rejected an analysis that did not compare employees with similar qualifications, education, and experience. These variables were relevant because they may have played a role in the decision making process. The employer had made a generalized decision of which employees were most valuable, taking into account anything it felt was relevant. The employers might well have decided to retain employees with more education or greater experience. Failure to eliminate the effects of education or experience could skew the data.

That is not the situation in this case. Cap Gemini was emphatic in its position that the only factor involved in deciding who to retain and who to terminate was projected short-term revenue production. It replied to Arentowicz's evidence about his training, experience, skills, and record of job performance by stating that these were irrelevant because they had no impact on the termination. Nothing counted but short-term revenue. Under these unusual circumstances, there is no reason to consider the possible effects of variables such as experience or job function because Cap Gemini did not consider them in it's decision making process. Neither Cap Gemini nor my fellow arbitrators have been able to articulate a rationale for how these additional variables could skew the data. The relevant decisions do not require a statistical analysis to compensate for variables that were not involved in the decision making process and do not affect the analysis.

I am also concerned that my colleagues are basing their decision on an argument that is not in the record. The record in this case is extensive. Both parties filed detailed pre-hearing briefs. There were three days of hearings. Both parties filed post-hearing briefs and then reply briefs. At no point did Cap Gemini argue, or even suggest, that Welsch's statistical analysis was flawed because it overlooks the variables in question.

To the contrary, Cap Gemini's only argument against Claimant's Welsch's analysis is that it did not include all employees at Arentowicz's level of the organization. Claimant's analysis included only vice presidents. Respondent argued that the position of director was at the same level, differing from vice presidents only in not having contact with clients. Cap Gemini submitted its own statistics, including both vice presidents and directors, which it claimed was the appropriate analysis in this case. It may well be correct on this point. However, Cap Gemini's own analysis shows an almost identical disparity between older and younger employees. Its exhibit (Table I, page 44 of post-hearing brief) shows a termination rate for vice presidents and directors under 40 of 6.25%, while the termination rate for those over 40 was 15.9%, two and one-half times larger.

I am very troubled by my colleagues' decision to ignore both the Claimant's and Respondent's exhibits and decide this issue on the basis of arguments Cap Gemini never raised and to which Arentowicz had no opportunity to respond. I am especially troubled because Arentowicz's statistical analysis was the strongest element of his case. The decision that it is worthless could well have changed the outcome of the case.

Cap Gemini's Case

The other significant point on which I differ from my colleagues is my assessment of the probative value of the evidence introduced by Cap Gemini.

Cap Gemini's articulated non-discriminatory reason for the termination is that Arentowicz's projected revenue was not sufficient. It argued that vice presidents needed to have projected revenue of $3 to $5 million to retain their jobs and that the projected revenue of Arentowicz' account were below this figure. If true, this is clearly a non-discriminatory basis for the decision.

Cap Gemini submitted virtually no evidence to support this position. It could have introduced the revenue projections (called "pipeline documents") for Arentowicz and the other vice presidents. It is undisputed that these documents existed. Cap Gemini has not produced these documents, nor has it given an adequate explanation for their absence. Rather, it attempts to place the blame for their absence on Arentowicz. Next Cap Gemini argues that it had no way of knowing that these documents needed to be retained. In support of this argument, it points to the date it received the complaint, almost one year after the termination. Cap Gemini fails to mention, however, that it received a demand letter from Arentowicz's attorney in April 2003, only four months after the termination.

In the absence of the pipeline documents themselves, Cap Gemini could have provided oral testimony regarding its revenue projections, especially the projection for Arentowicz, and explained why it was more realistic than Arentowicz's own projection.

Cap Gemini did not provide this evidence either. Its principal witness was David Wilson, Arentowicz's former supervisor who made the termination decision. Wilson admitted

5

that he did not remember Arentowicz and Gray's revenue projection (even approximately), his own revenue projection for Arentowicz, or why Arentowicz's projection was overly optimistic. Indeed, it is difficult to see how Wilson could have made such a determination. By his own admission, he was new to the Life Sciences division and had not had time to acquire significant personal knowledge of the division and its clients. Nor did he ever speak to Arentowicz about the revenue he projected in order to gauge its reasonableness. Nor did he speak to anyone at Merck, which represented the vast majority of the revenue Arentowicz generated, or any of Arentowicz's other clients. Nor does the record reflect any other means by which Wilson received information that would differ from the projection submitted by Arentowicz. It is difficult to believe that Wilson acted on the basis of information the record indicates that he did not have.

It is true that Wilson testified at length regarding the process by which he claims the termination decisions were reached. None of this testimony, however, indicates that Wilson had any source of information about the revenue Arentowicz would generate other than the Arentowica/Gray projection and Merck's past business with Cap Gemini, both of which indicated that Arentowicz would produce enough revenue to be retained.

In addition, Wilson's testimony of the process itself was demonstrably wrong on at least one important point. Wilson claimed that he discussed the termination decisions in some depth with other senior people in the Life Sciences division, including Joseph Lemaire. Lamaire, however, testified that Wilson had never discussed the decision with him.

In addition, the one relevant Cap Gemini document concerning the reason for the termination directly contradicts Wilson's testimony. The "business case" (R-13) states that the reason for the termination is that Merck has become a global account and there is no alternative position for him. This document was not prepared by Wilson, and appears to have been prepared slightly before the decision to terminate Arentowicz. Thus, it does not have great significance. However, the fact that the only relevant document contradicts Wilson's testimony does not help Cap Gemini's case.

In light of all these factors, I believe Wilson's testimony has little, if any, probative value.

None of Cap Gemini's other witnesses had any of the information Wilson apparently lacked. Nor were they the decision makers. Wilson testified that, while he discussed the situation with others, he alone made the decision.

Conclusion

Arentowicz's case is not overwhelming. He has not introduced a "smoking gun" that proves the decision to terminate him was based on his age. Such evidence, however, is not required. An employer of even modest sophistication can easily discriminate without making an obvious blunder. For this reason, the law does not require a smoking gun and allows employees to show discrimination through less direct and obvious evidence.

6

In doing so, the employee need not present conclusive evidence. The legal standard is that the preponderance of the evidence must favor the employee. I believe that the Arentowicz has submitted significant evidence of discrimination (when the statistical evidence is evaluated by the correct legal standard), while Cap Gemini has provided nothing of substance, despite the fact that it had control of documents that went to the core of the dispute.

Under these circumstances, I believe that we should have found in favor of Arentowicz.

                Lewis L. Maltby
                Arbitrator